Richard L. SCHLEGEL

v.

The UNITED STATES.

No. 369–63.

United States Court of Claims.

Oct. 17, 1969.

Rufus W. Peckham, Jr., Washington, D. C., for plaintiff. Carl L. Shipley, Washington, D. C., attorney of record; Shipley, Akerman & Pickett, Washington, D. C., of counsel.

Edward Weintraub, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION *

SKELTON, Judge, delivered the opinion of the court:

This is a civilian pay case in which the discharged employee, Richard Schlegel, is entitled to the benefits of the Veterans' Preference Act of 1944, 58 Stat. 387, as amended, 5 U.S.C. § 851 et seq.

Prior to his removal on July 31, 1961, the petitioner had served creditably as a civilian in the Department of the Army, Office of Transportation, in Hawaii. Occasionally, plaintiff would serve as Staff Duty Officer after normal working hours or on weekends. During these occasions, whenever a "top secret" message was received at the office, the plaintiff could not read it because he possessed only a "secret" security clearance. Consequently, he would have to inform a person with "top secret" security clearance upon receipt of the message. Since over 50 percent of the material which passed through the office was "secret or higher," the plaintiff's superiors determined that his security clearance should be upgraded to "top secret." A routine request for such clearance was instituted by Colonel Jean Sams, the Transportation Officer for the headquarters of the Army structure in the Pacific. The requested clearance was withheld, and subsequently, Colonel Sams received from Army Intelligence investigative reports which described participation by plaintiff in homosexual activities. On June 29, 1961, the plaintiff was served with an advance Notice of Proposed Removal issued by Colonel Sams. The letter reads in pertinent part:

1. You are hereby notified that it is proposed to effect your removal from your position as Administrative Officer (Program and Budget), GS-341-12, Office of the Transportation Officer, United States Army, Pacific, APO 958, on 31 July 1961, for immoral and indecent conduct.

2. Specifically, the following charges are alleged against you in support of the proposed action:

a. That, in or about August 1959, at your home in Honolulu, Hawaii, you did commit immoral and indecent acts with Francis E. Deller, by fondling his penis and asking him if he would "give in" to you.

b. That, on or about 10 June 1960, at 2052 Mott-Smith Drive,

* We are indebted to Trial Commissioner Franklin M. Stone for his findings of fact which we have adopted in their entirety.

Honolulu, Hawaii, you did commit immoral and indecent acts with Lance Corporal Harry Hoyt Jordan, Jr. by fondling his penis, masturbating him, and asking him to play with your private parts.

c. That, on or about 24 June 1960, at 2052 Mott-Smith Drive, Honolulu, Hawaii, you did commit immoral and indecent acts with Lance Corporal Harry Hoyt Jordan, Jr. by unfastening his underwear, fondling his penis, masturbating him until he reached a climax, attempting to commit anal sodomy with him, and forcing yourself upon him when he resisted your advances, thereby tearing his underwear.

d. That, in or about September 1960, at your apartment in Honolulu, Hawaii, you did commit immoral and indecent acts with Lance Corporal Freddie L. Riddles, by undressing him, fondling his private parts, and masturbating him until he experienced an orgasm.

3. Your conduct as charged in paragraph 2 above is of such a nature that it reflects discredit upon this installation, the Department of the Army, and the ethical stature of Federal employees. This conduct, specifically as it pertains to your sexual relations with other men, defiles our social standards, and this command has an obligation to protect its employees against associations that might be detrimental to their standards of moral ethics.

4. You have the right to answer this notice of proposed action personally, in writing, or both, to Colonel Jean P. Sams, Transportation Officer, Hq USARPAC, APO 958, or in the event of my absence to my delegated representative, Colonel E. P. Ketcham, Jr, Transportation Office, Hq USARPAC, APO 958, and to submit any and all evidence, including witnesses and affidavits you may desire within ten working days from the date of receipt of this notice. Your right of personal reply does not contemplate a hearing with testimony from witnesses for both sides of the controversy; rather it is an opportunity for your personal refutation of this advance notice. If you desire to reply in person, you will be afforded an opportunity to be heard and you may be accompanied by a representative if you so desire. A written record will be made of your personal reply and your signature requested to indicate that you agree with the accuracy of the record.

5. Mr. Henry L. Radi of the Office of Civilian Personnel Building S–330, Ordnance Area, Fort Shafter, will make such pertinent regulations and records available as you may require for preparation of your reply.

The plaintiff requested copies of pertinent regulations and an extension of time to file a reply. These requests were granted, and on July 19, 1961, the plaintiff replied to the charges, neither admitting nor denying them.[1] Instead, he submitted a letter and attached documents which, among other things, defended private, consensual, homosexual behavior among adults. The Army, however, decided to remove plaintiff effective July 31, 1961, and issued a Notice of Decision to that effect on July 27, 1961.

Plaintiff appealed this decision to the regional office of the Civil Service Commission. At the hearing, the affidavits of marines Riddles, Jordan, and Deller, which fully described the alleged homosexual acts of plaintiff contained in the removal notice, were introduced into evidence. Despite the fact that plaintiff requested Colonel Sams to produce several witnesses, including the three marines, the only witness who appeared was Harold Eubanks, the Civilian Personnel Director. The removal action

---

1. Plaintiff did not deny these charges until the trial of this case before Commissioner Stone. See finding 26.

was sustained by the regional office of the Civil Service Commission on September 28, 1961. The Board of Appeals and Review of the Civil Service Commission upheld the regional decision on January 20, 1962.

The petitioner filed suit in the Court of Claims on December 20, 1963, and the case was referred to Commissioner Stone. At the trial in this court, marine Riddles testified that all of the information contained in the affidavit executed by him in 1961 was true and that he had given it voluntarily. Additionally, Colonel Sams and other witnesses who were absent at the Civil Service Commission hearing were present at the trial.

Before the specific issues in this case are discussed, the general guidelines for review by this court should be recognized. As we stated in Morelli v. United States, 177 Ct.Cl. 848, 858 (1966):

> The power of removal from office in the executive branch of the Federal Government, absent some specific provision to the contrary, is incident to the power of appointment. Keim v. United States, 177 U.S. 290, 293 [20 S.Ct. 574, 44 L.Ed. 774] (1900). Where an administrative agency has complied with the prescribed procedural requirements, the Court of Claims can only review the action to determine whether the officials who effected the dismissal acted arbitrarily, capriciously or were so grossly erroneous as to be in bad faith, as for instance where they may have acted without substantial evidence to support their decision or where they exceeded their authority. Bayly v. United States, 99 Ct.Cl. 598 (1943); Love v. United States, 119 Ct.Cl. 486, 493, 98 F.Supp. 770, 774 (1951), cert. denied, 342 U.S. 866 [72 S.Ct. 106, 96 L.Ed. 651].

Thus, there are essentially two focal points which comprise our scope of review. One involves a consideration of whether the agency violated its own regulations in effecting the employee's ultimate removal. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). The other concerns the question of whether the employee's removal was accomplished in an arbitrary or capricious manner or was consummated without substantial evidence to support such action. Beckham v. United States, 375 F.2d 782, 785, 179 Ct.Cl. 539, 543–544 (1967), cert. denied, 389 U.S. 1011, 88 S.Ct. 583, 19 L.Ed.2d 613. Moreover, in considering the issues of arbitrariness and lack of substantial evidence, we are entitled to review all available evidence, including *de novo* evidence taken before one of our commissioners, as well as the administrative record. Brown v. United States, 396 F.2d 989, 184 Ct.Cl. 501 (1968); Beckham v. United States, *supra.*

After weighing the arguments of both parties and examining carefully the evidence in its entirety, we conclude that the plaintiff's removal was proper and must stand.

I

The petitioner contends that the charges against him in the advance Notice of Proposed Removal lacked the specificity required by Department of the Army Civilian Personnel Regulations (hereinafter CPR) S1.2, 2–2.*d.* (February 1961), which provides:

*Reasons for the Action*

d. The advance notice must state *all of the reasons* for the proposed action, specifically and in detail. The stated reasons are required to be supported by evidence such as dates, incidents, witnesses, or references to actions, so that the employee will be able to understand with certainty exactly why the action is proposed and exactly what offenses, delinquency in conduct or performance, or reasons, are being relied upon. Appointing officers cannot rely upon a notice of decision, grievance hearings, conversation, or subsequent correspondence

with the employee as a means of amplifying the charges. Neither can the appointing officer state general reasons upon the presumption, even though warranted, that the employee will readily understand the basis for the proposed action. * * *. [Emphasis in original.]

This court has recently stated the principles of law governing Veterans' Preference Act removal notices in Burkett v. United States, 402 F.2d 1002, 1004, 185 Ct.Cl. 631, 634 (1968), where the court said:

A. *Inadequacy of the notice of charges.* Section 14 of the Veterans' Preference Act, 5 U.S.C. § 863 (1964) (currently 5 U.S.C. § 7512(b) (Supp. III 1965–67)), orders that, for a veteran, the notice must state "any and all reasons, specifically and in detail, for the proposed action." This requirement, the court has explained, is meant "to afford the employee a *fair opportunity* to oppose his removal, and the charges must be considered with the view of determining whether plaintiff was informed of the basis of the proposed action with *sufficient particularity* to apprise him of allegations he must refute or acts he must justify. The technical rules of criminal proceedings are not applicable here, *and the facts and circumstances of a particular case are regarded as important in such an inquiry"* * *. [Emphasis previously added.]

The plaintiff complains that the notice of proposed removal identifies only one "charge," *i. e.* "immoral and indecent conduct." He contends that this vague and unspecific "charge" is accompanied by four specifications which are incidental to the "charge" and which cannot be considered "charges" themselves. The plaintiff's alleged confusion about the exact nature of the "charges" against him is a specious but apocryphal argument. Initially, the notice of proposed removal itself refers to the four

enumerated instances of misconduct as "charges." In paragraph 2., the letter states:

2. Specifically, the following *charges* are alleged against you * * *: [Emphasis supplied.]

Later, in paragraph 3, the letter states:

3. Your conduct as *charged* in paragraph 2 * * *. [Emphasis supplied.]

Thus, the literal terms of the notice of proposed removal indicate that the alleged incidents of misconduct are "charges," rather than specifications which support one single "charge."

In addition, the requirements of Burkett v. United States, *supra*, have been satisfied. There can be no doubt that the plaintiff was informed with specific certainty of the nature of the conduct for which removal was contemplated. Indeed, the detailed descriptions are painfully precise and exact. But even assuming, *arguendo*, that the allegations against him were ambiguous, the plaintiff did not suffer a lack of understanding regarding the reasons for his proposed removal. Quite to the contrary, he prepared an exhaustive reply to the removal notice, therein indicating an accurate comprehension of the reasons for his proposed removal. As this court has held, where the plaintiff is aware of the charges against him, his complaints concerning ambiguity will be rejected. Greenway v. United States, 175 Ct.Cl. 350, 358 (1966), cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108, reh. denied, 385 U.S. 954, 87 S.Ct. 327, 17 L.Ed.2d 223; Queen v. United States, 137 Ct.Cl. 167 (1956). For all of the foregoing reasons, the charge did not lack the specificity required by law.

## II

■ The published applicable Army regulations regarding dismissal upon charges are CPR S1.2, S1.3 (February

1961) and CPR S1.2 (March 1961). CPR S1.2–2 states in pertinent part:

\* \* \* \* \* \*

### Relationship of Action to Efficiency of the Service

b. A requirement of both the Lloyd-LaFollette and Veterans' Preference Acts is that adverse actions will be taken only for such cause as will promote the efficiency of the service. Therefore, the advance notice should show the manner in which the proposed action is related either to the employee's duty performance or to the carrying out of the mission of the installation.

\* \* \* \* \* \*

CPR S1.3–3 relates to adverse actions initiated by the appointing officer and reads in pertinent part:

\* \* \* \* \* \*

### Guidelines

\* \* \*

c.

\* \* \* \* \* \*

(2) Misconduct while off duty does not, in itself, serve as a basis for removal. There must be a showing that the misconduct affected the employee's performance on the job, or the specific manner in which the misconduct reflected discredit upon the Department of the Army or the employing installation, or the manner in which the misconduct was otherwise detrimental to the efficiency of the service.

Despite the plaintiff's protestations to the contrary, the government is not using these regulations to usurp the police power of the state of Hawaii by controlling the private conduct of Army employees. And this court certainly lacks the temerity to install itself as an arbiter of moral propriety among government workers. Nevertheless, under the regulations quoted above, when an employee's mis-

conduct impairs the efficiency of the service, he can be removed from his position regardless of his ability to reconcile his behavior with his personal standard of morality. Specific regulations describing certain acts of homosexuality are not required. No regulatory scheme can anticipate every particular instance where employee misconduct might occur. Consequently, regulations are frequently couched in general terms, as in CPR S1.3–3c(2).

The necessity for broad provisions is recognized also in Appendix B to CPR C2, where penalties used as a general guide for disciplinary action are suggested for various instances of misconduct. Table I in the appendix is entitled "Penalties for Delinquency or Misconduct." Under this table, one of the listed offenses is "Immoral or indecent conduct," and one of the suggested penalties for the first offense is removal. Moreover, there can be no doubt that the plaintiff was aware of the standard of conduct expected of him, as required by CPR C2.1–3.a.[2] The affidavit of marine Deller stated that the plaintiff asked Deller to keep secret his advances and expressed fear of losing his job with the Army if his homosexual tendencies were known. Thus, the record is clear that plaintiff knew what standard of conduct was expected of him. Of course, his variation from this expected standard of conduct must be termed "misconduct."

Under CPR S1.3–3c(2), misconduct alone cannot be used as a basis for removal. The misconduct must affect the employee's performance, reflect discredit upon the employing installation, or detrimentally affect the efficiency of the service. Furthermore, since plaintiff is a veteran, his removal must promote the efficiency of the service in order to comply with CPR S1.2–2b and the Veterans' Preference Act of 1944, 5 U.S.C. § 863 (1964) (currently 5 U.S.C. § 7512(b) (Supp. IV 1965–68)). If the record sup-

2. CPR C2.1–3 a. provides: Each employee is responsible for acquainting himself with the standards of conduct expected of him, and to conduct himself, both on and off the job, in a manner which will insure that his activities reflect credit on the Federal Government and the Department of the Army.

ports the position that the plaintiff's misconduct was detrimental to the efficiency of the service and that his removal will promote the efficiency of the service. both the Veterans' Preference Act and the Army regulations will have been satisfied.

Whether a person's discharge will promote the efficiency of the service is an administrative decision to be determined within the discretion of the agency, and no court has power to review the action, if taken in good faith. Brownell v. United States, 164 Ct.Cl. 406, 408–409 (1964); Gadsden v. United States, 78 F. Supp. 126, 111 Ct.Cl. 487, 489 (1948). At the trial of the instant case before Commissioner Stone, three of plaintiff's superiors offered testimony indicating that the morale and efficiency of the office would have been affected by plaintiff's continued presence. This testimony, when coupled with the administrative determinations concerning efficiency of the service, constitutes convincing proof that plaintiff's removal promoted the efficiency of the service and eliminated plaintiff's detrimental influence on the efficiency of the service.

This case can be distinguished on the facts from Norton v. Macy, 417 F.2d 1161 (No. 21,625, decided July 1, 1969), by the U.S.Court of Appeals for the District of Columbia Circuit. In that case the alleged wrongful act by the plaintiff, which was termed a "homosexual advance" toward another adult male, for which he was dismissed from government service as being immoral conduct and to promote the efficiency of the service, falls far short of the homosexual acts committed by the plaintitf in the instant case. In that case, the evidence showed that the plaintiff, while driving his car on a public street in downtown Washington, D. C., "felt the leg" of an adult male passenger riding in the car with him. The passenger only rode about four blocks with the plaintiff (once around Lafayette Square) and then got out of the car. The passenger interpreted plaintiff's act as a homosexual advance. The plaintiff denied it. There was no evidence of any other act between the plaintiff and the passenger that was homosexual in character. The plaintiff was dismissed from his job on these facts. The Circuit Court of Appeals held that the dismissal was improper, with Judge Tamm dissenting.

The facts in our case are completely different. The evidence shows that the plaintiff committed four homosexual acts on three different adult males on four different occasions. There is no doubt as to the homosexual character and completeness of the acts. Any schoolboy knows that a homosexual act is immoral, indecent, lewd, and obscene. Adult persons are even more conscious that this is true. If activities of this kind are allowed to be practiced in a government department, it is inevitable that the efficiency of the service will in time be adversely affected. In our case, it was determined by the Army and the Civil Service Commission that the plaintiff was guilty of immoral and indecent conduct which impaired the efficiency of the service and that his removal would promote the efficiency of the service. We agree.

III

Plaintiff also contends that he had an employment contract with the Army and that this contract was abrogated illegally by his removal. At the time of plaintiff's employment with the Army, persons recruited from the continental United States were required to agree to three-year terms of service in order to qualify for paid transportation, home leave, and other benefits. Before his removal, the petitioner had served one three-year term and had executed, on November 9, 1960, an application for re-employment leave and a new transportation agreement to become effective February 20, 1961. Plaintiff asserts that this agreement was an employment contract and relies upon an Army memo-

randum not in evidence to support this contention. Paragraph 8 of this memorandum, Army Pacific Memorandum No. 690–15, provides:

Re-employment leave applications submitted by eligible employees will be approved when:

(1) Workload conditions permit;

(2) Employee's job performance and general suitability are such that he would be recommended for an additional tour of duty;

(3) There is reasonable assurance that a need for employee's services will continue to exist.

In addition to this memorandum, the plaintiff argues that the Army recognized the contractual nature of his agreement in the Notice of Decision letter of July 27, 1961, which stated in part:

. * * * * * *

2. Since you will have completed only approximately five (5) months of your current transportation agreement, executed by you on 9 November 1960 and which became effective 20 February 1961, your date of return to Hawaii from reemployment leave, you are not eligible for return transportation at government expense to your actual residence. Such travel must be at your own expense. In addition, you will be required to reimburse the U.S. Government for all expenses incurred by the government incident to your return travel from reemployment leave from Lewisburg, Pennsylvania. However, shipment of your household goods to Lewisburg, Pennsylvania will be authorized since you did complete your minimum period of service.

* * * * * *

The plaintiff's theory for recovery is that, after one tour of duty, the Army must satisfy itself as to his suitability before agreeing to subsequent three-year agreements and cannot remove him except for misconduct occurring *after* the new agreement. This requirement, plaintiff asserts, is stated in section (2) of paragraph 8 of the Army memorandum quoted above. In addition, the petitioner relies upon Murray v. United State, 154 Ct.Cl. 185 (1961), to support this argument. In *Murray*, the plaintiff was discharged during his fourth enlistment in the military for participation in homosexual acts committed during earlier enlistments. The regulation governing removals confined discharge actions to misconduct which occurred during the current term of enlistment. Since the plaintiff was discharged honorably after his first three enlistments, he could be discharged under conditions less than honorable only for improper conduct subsequent to the fourth enlistment. Consequently, his discharge was improper.

Plaintiff Schlegel urges an extension of the *Murray* reasoning to the instant case. It is uncontroverted that the plaintiff's agreement to serve another three years was made at a time when his superiors considered him a suitable employee. However, the analogy to the *Murray* case and the principles underlying that decision breaks down under close scrutiny. In the case *sub judice,* the agreement which the plaintiff characterizes as an employment contract is nothing more than an agreement for transportation. Although plaintiff has not favored us with the entire memorandum upon which he relies, the selected portion of that memorandum which plaintiff quotes reflects that the agreement does not relate to tenure of employment. Additionally, the *Murray* decision was predicated upon a distinctive regulation which required removal to be based upon misconduct occurring in the current enlistment of the serviceman. There is no similar regulation in the present case. Accordingly, the Army did not abrogate a contractual relationship with the plaintiff by removing him from his position.

 In a somewhat related vein the plaintiff objects to his removal as being

untimely in violation of CPR S1.2–2d (2), which states:

*Reasons for the Action*

d. * * *

* * * * * *

(2) The incidents or events cited should be timely in relationship to the action proposed.

* * * * * *

The incidents of misconduct cited in the advance Notice of Proposed Removal took place in August 1959, on June 10, 1960, on June 24, 1960, and in September 1960. The removal notice was dated June 29, 1961, approximately one year subsequent to three of the four instances of alleged misconduct. Although the timeliness of a removal action is an issue of law, we are not persuaded to disagree with the Civil Service Commission. The incidents for which the plaintiff was ultimately removed were unknown to the Army at the time they occurred. Rather, they came to the attention of the Army in the course of its investigation to upgrade plaintiff's security clearance. Since this investigation transpired in the early part of 1961, less than six months elapsed from the time the Army became aware of the plaintiff's misconduct until the date of the proposed removal notice on June 29, 1961. Considering the entire record, it cannot be said that the removal was untimely in relation to the cited instances of misconduct.

### IV

██ Petitioner next contends that the Army violated one of its regulations by relying on a cross-reference to a document outside the advance notice as a basis for the removal action. The regulation allegedly violated is CPR S1.2d, which reads in pertinent part:

*Reasons for the Action*

* * * Nor should the advance notice rely on cross references to other documents outside the notice as a basis for the action.

* * * * * *

The plaintiff asserts that the advance notice relied on a cross-reference to an Army memorandum of March 13, 1952, entitled "Procedure for Handling Cases of Alleged Perversion (Civilian Employees)."

A reading of the advance notice reveals no cross-reference to the Army memorandum of 1952. In fact, the record shows that the memorandum was not even used in preparing the advance notice. Although Army Personnel Officer Eubanks testified that the document stated the "essence of our position" and that it contained guidelines for immoral and indecent conduct, he did not testify that the charges against the plaintiff were drafted in reliance upon the Army memorandum. The record supports the view that the advance notice was drafted upon the exclusive basis of CPR S1.2 and S1.3 and that the plaintiff's removal was grounded solely on these regulations. Furthermore, the advance notice itself contains no reference to any document outside the notice. Thus, not only does the advance notice comply with the literal terms of CPR S1.2d, but it also withstands the plaintiff's expanded interpretation of the regulation that the notice cannot be *prepared* in reliance upon a document not included in the notice. Even assuming, *arguendo*, that the plaintiff's interpretation of the regulation is accurate and that the Army memorandum was used in drafting the removal notice, the result would remain unchanged because the memorandum merely involved procedure (as the title states). Its omission from the removal notice could not affect the plaintiff's substantive rights.

### V

██ We are urged by the plaintiff to adopt what he terms the "logical extension" of Stanley v. Georgia, 394 U.S. 557,

89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). In that case, the Supreme Court declined to uphold the validity of a statute which imposed criminal sanctions for the mere possession of obscene matter in one's private home. The instant case is clearly distinguishable from the *Stanley* decision, which involved a criminal prosecution for violating a penal statute. The plaintiff in the present suit was not prosecuted but was merely removed from his position with the Army. The criminally accused stands in the reach of more constitutional protections than does the civil service employee who is being removed for misconduct. Additionally, the government has not prohibited Mr. Schlegel from committing homosexual acts. Nor has it imposed a criminal penalty upon him for having done so. Rather, the Army has discharged the plaintiff from his position for misconduct in order to enhance the efficiency of the Transportation Office. We cannot adopt the urged extension of Stanley v. Georgia, *supra.*

### VI

■ Finally, the plaintiff contends that the Army violated CPR E2.1–3a (March 1956), which provides in part:

 \* \* \* [E]mployees will be treated fairly in all respects \* \* \*.

Specifically, the plaintiff complains that the hearing accorded him subsequent to his removal was patently unfair in that he was denied the right of confrontation and cross-examination of his accusers. Only Harold Eubanks testified at the Civil Service Commission hearing, and this destroyed the plaintiff's strategy for eliciting favorable testimony from several witnesses which he expected the Army to produce in response to his requests.

We cannot conclude that the plaintiff was mistreated at this level. Since the Civil Service Commission has no subpoena power, an employee desiring the presence of witnesses at his hearing has the initial burden of making timely and sufficient efforts to obtain their presence or of showing that he was justified in failing to make such attempts. Williams v. Zuckert, 371 U.S. 531, 83 S.Ct. 403, 9 L.Ed.2d 486 (1963); 372 U.S. 765, 83 S.Ct. 1102, 10 L.Ed.2d 136 (1963); Begendorf v. United States, 340 F.2d 362, 169 Ct.Cl. 293 (1965). Plaintiff has failed to carry this burden. On September 8, 1961, only three working days prior to the hearing, he wrote Colonel Sams, requesting that Sams appear and that he arrange for the attendance of the three marines. Colonel Sams, of course, had no power over the marines since he was an Army Officer. No further action was taken by the plaintiff to secure the presence of these witnesses. Although he asserts that he did not know the location of the marines, the plaintiff admits that he did not request information or assistance from the local marine commandant. His belated attempt to obtain the presence of the desired witnesses fell far short of the efforts required by *Begendorf* and *Zuckert, supra.* Moreover, one of the marines testified at the trial before Commissioner Stone along with three Army officers whose presence the plaintiff requested at the Civil Service Commission hearing. As previously indicated, we can consider this de novo evidence in conjunction with the administrative record in determining whether the plaintiff was treated fairly. Brown v. United States, *supra.*

### VII

From a careful review of the entire record, it is concluded that the plaintiff's removal was not the result of arbitrary or capricious action. Rather, it was carried out in accordance with applicable Army regulations. Relief is denied, judgment is entered for the defendant, and the petition is dismissed.

DAVIS, Judge (concurring):

I join in the result, and fully in all of the opinion except Part II. As for that portion, I agree with most of what the court says but, in the light of the discus-

sion in Norton v. Macy, 417 F.2d 1161 (D.C. Cir. No. 21,625, decided July 1, 1969), I would confine our present holding to the particular circumstances of this case. The significant factors here are: (a) the nature of plaintiff's conduct, which was explicit and overt and (at least as to one charge) appears to have violated the criminal law of Hawaii (see Sec. 768–71—sodomy); (b) the recency and repeated nature of that conduct, and plaintiff's defense of it (thus indicating that he would continue in that course); (c) the security requirements of plaintiff's office and position (in that connection it is not irrelevant that plaintiff's acts were committed with military personnel)[1]; and (d) the testimony that retention of plaintiff would negatively affect the operation of the office. These factors were not present in *Norton*, as the District of Columbia Circuit saw that case.

NICHOLS, Judge (concurring):

I join in the decision and in the court's opinion except that I do not agree with the court's discussion of the recent case of Norton v. Macy, 417 F.2d 1161 (No. 21,625, decided July 1, 1969, in the D.C. Circuit). The court sets forth factual differences between that case and this, and could have referred to further differences, as I will show. Still, the D.C. panel concedes in the most candid manner that the Civil Service Commission could have found that Norton's conduct was immoral, indecent, and notoriously disgraceful. Thus, I am not sure that the panel would not have reached the same result if Norton had been shown to have done exactly what Schlegel did in the case before us. If the gravamen of the offense was, as I believe it was, exposing the employing agency to disrepute, Norton in making homosexual advances to a total stranger, under the observation of two policemen, could have been deemed more heedless of his employer's reputation than Schlegel was.

The reasoning of the panel (except, of course, for Judge Tamm who published an able dissent) is I believe as follows: a veteran with career status may not be removed from Federal employment except for a cause that will further the efficiency of the service; homosexual behavior off duty does not normally harm the employing agency except by occasioning embarrassment to it; the avoidance of embarrassment has no logical relationship to efficiency; therefore, such a veteran is privileged, so far as his employer is concerned, to engage in homosexual behavior in his off duty hours as much as he pleases. The court was careful to make it clear its decision would not be precedent when a nexus with efficiency appeared, other than agency embarrassment.

In this context the word "embarrassment" may appear to some the understatement of 1969. The belief and policy of the executive branch, as it emerges clearly in the record now before us, and in the numberless other cases involving homosexuals that stain the pages of our reports, is that the presence of known homosexuals in an executive agency will bring the agency into hatred, ridicule, and contempt, to the grave detriment of its ability to perform its mission. By denigrating this consideration to mere "embarrassment" the court in effect says that public relations are none of an agency's proper concern, not being related to "efficiency."

It may well be that defendant's fear of bad public relations is exaggerated, and that the Government's handling of its obviously large homosexual problem is not of the wisest. I do not pretend to know. The point is, as Judge Tamm says, the choice as to what measures are required to produce efficiency is properly one for the executive branch to

---

[1] In the *Norton* case, the court said (p. 10, slip opinion): "The homosexual conduct of an employee might bear on the efficiency of the service in a number of ways.

Because of the potential for blackmail, it might jeopardize the security of classified communications."

make. The *Norton* case, as he observes, represents another taking over by the all-wise judiciary of an area of decision hitherto reserved for the presumptively feeble intellects of the legislative and executive branches.

An agency is not necessarily wrong if it deems that good public relations favor efficiency, and that bad ones detract from it. I believe that myself. Nor is it absurd to fear that a public which loses respect for the employees of an agency will lose respect for the agency itself. It follows that the agency has (or, up to now, had) a right to require its employees to refrain from off duty behavior of kinds the public will regard (however obtusely) as scandalous and disgraceful. Schlegel knew his agency had such a requirement and he deliberately elected to disobey it.

In the instant case, however, the "embarrassment," though in my view sufficient, is not the sole nexus between the removal of plaintiff and the efficiency of the service. The record shows that many "top secret" papers were passing through his office. How this came about in a mundane transportation service in time of peace is not explained in the record, but presumably the mere travel routing of some military personnel might, if known, imperil their missions. Plaintiff had a "secret" clearance, which was not high enough, and he had to be barred from participating in much of the office work. The request on his behalf for a "top secret" clearance was what led to his downfall. The disclosures in the security investigation would no doubt have caused the lifting of even the "secret" clearance had plaintiff not been fired altogether. Though the point is not spelled out in the record, it seems too obvious to require proof that the usefulness of a civilian employed in a military department is gravely impaired if he cannot be cleared for security. When this impairment is due to the employee's own misconduct, dismissal does not seem an unreasonable or excessive response. The *Norton* court noted the absence of any security problem in Norton's case and it

would seem it might well regard the difference in *Schlegel's* as crucial.

Furthermore, Schlegel is shown by the evidence to have been engaged in corrupting young soldiers who might have been deemed to be under the parental care of their Service. Their usefulness was impaired, too, by plaintiff's acts.