Nichols, Judge,
concurs in the result as follows:
Since I do not agree with statements in the majority opinion, yet have decided to vote against rehearing because I do agree with the result, I respectfully submit this statement of my views.
*369 The Maryland court proceedings dealing with. Mr. Wathen, as reported in the majority opinion, seem at first blush to furnish a prime example of the reasons why people are losing faith in our system of criminal justice, and must eventually subject it to sweeping reforms. However, the careful opinion and findings of Trial Judge Philip B. Miller, afford no basis to impugn the good faith of anyone concerned, or the legal correctness of the Maryland judicial rulings, or the professional competence of the psychiatrists who achieved, according to themselves, such an apparently miraculous cure. If defendant had offered evidence on these points we might have had a different case. There are limits to res judicata and collateral estoppel in cases, e.g., of fraud on the court, but such issues do not confront us here. Though we are a society that recoils in horror against taking of life by the state, we treat such taking by anyone else as a very minor peccadillo. The fact remains plaintiff has blood on his hands, and all the absolution the psychiatrists can offer will not suffice to wash it off.
The panel attacks its case the hard way by raising the vexed, but here I think moot, issue as to whether, or to what extent, an administrative decision that a removal will promote the efficiency of the service, is subject to judicial review. At one time I took issue with Norton v. Macy, 417 F. 2d 1161 (D.C. Cir. 1969), which innovated such review, believing it to be a judicial intrusion into an area reserved for executive discretion when it is a matter, at least, of deciding what kinds of behavior are detrimental to service interests. I am gratified to see others coming to my opinion, but I am no longer so sure of it myself. It is anomalous to have a single separate area of decision making excluded from judicial review when such exclusion is not based on express statutory provisions, absent here. When Congress desires to preclude judicial review it knows how to do it. Chambers v. United States, 196 Ct. Cl. 186, 451 F. 2d 1045 (1971). However judges must be careful not to presume automatically that their wisdom is superior. Bunning executive agencies is difficult enough even for those appointed to do so and in daily contact with the problems. Identification of service interests and weighing priorities with respect thereto are *370 matters of high executive discretion. Where Norton v. Macy went wrong was in giving insufficient respect to the agency’s ideas as to what was needed to maintain its efficiency, not in venturing on forbidden territory. Yet, particularly in the area of alleged off-duty misconduct, there can easily be, and in the past, have been, abuses of executive discretion in unreasonable efforts to regulate the off-duty behavior of Government employees.
In Schlegel v. United States, 189 Ct. Cl. 30, 416 F. 2d 1372 (1969), cert. denied, 397 U.S. 1039 (1970), the court majority seemed to me to have it both ways, reviewing favorably the administrative determination of what was good for the service, while asserting it was immune from such review. It attempted to distinguish Norton v. Macy on the facts instead of disapproving it as I would have done. The panel majority here may be right as to the almost irrefragable proof required to overturn the executive decision, if you limit it to on-duty misconduct, yet be wrong as to off-duty misconduct.
The issue is moot, for me, in Wathen’s case, because it is for me too plain for argument that it is not good for the Internal Revenue Service’s efficiency to employ an agent with Mr. Wathen’s history, i.e., one who has taken life — even if only once — in a fit of dissociation when faced with apparently insurmountable stress and emotional trauma, has avoided (in the lawyer’s dichotomy, I do not say evaded) the law’s penalty for murder on the ground of insanity, and has won release shortly thereafter on the ground of feeing perfectly sane. Such people have their qualities, and there must be a niche for them somewhere, but surely not in the IRS ! I cannot help asking how a taxpayer would like having Mr. Wathen call on him to audit his tax returns. Would he eye him for a suspicious bulge, or ask him to undergo a pat-down search ? The dissent in this case is not written out of perfect faith in the psychiatrist’s one in ten thousand estimate of the chances of a relapse, at the dissent’s caveat against ordering reinstatement shows. But if Wathen should not be reinstated in 1976, how can the agency be faulted for not doing so in 1966 ?
The real question is whether the offense violated any regulation of the IRS. “Conduct to discredit” is a concept derived *371 from military law. We know from Parker v. Levy, 417 U.S. 733 (1974), that it adequately describes a host of off-duty offenses. Testimony that the behavior actually lowered public esteem for the agency, or did not, should not be required in every case. We know by the Maryland court decisions that Wathen was not guilty of murder. Our trial judge analizes the holdings as indicating a lack of mens rea because of Wathen’s temporary psychiatric condition, and he would read a mens rea requirement into the IES regulation too. It is not correct to say that Wathen was exonerated of all legal fault. I do not think mens rea is required for a civil action for wrongful death. The Maryland courts did not have this issue before them. One could well suppose, and I do suppose, that Wathen may be or have been liable to the heirs or next of kin of his victim, Miss McLaughlin. The way the agency testified, and the way it framed its charges, it is clear it considered that homicide without mens rea was conduct to discredit. They would not properly apply it, of course, to a purely accidental homicide, free of all fault, but that is not this case, nor is a homicide in self-defense. It seems to me a perfectly rational application of the prohibition against conduct to discredit, to apply it to all homicides except those where the employee is or should be exonerated of legal fault, noting the difference between being without fault and without mens rea. In this case, so far as we know, he has never been exonerated of anything except the charge of murder, and he was exonerated of that on grounds, lack of mens rea, that would have no impact on civil liability.
By my analysis, therefore, the plaintiff is not aided by his acquittal and it may be moot whether the agency’s case should be evaluated as it was when the plaintiff was dismissed, or as of the final stage of administrative review, as the dissent urges. As to this, if we must decide it, I agree with the dissent. We held in Peden v. United States, 206 Ct Cl 329, 512 F. 2d 1099 (1975) that the agency could use as part of its “substantial evidence” at the hearing, newly discovered or newly available incriminating testimony the agency did not have when it terminated the plaintiff’s employment. It would seem to follow he should have a right to use new evidence or *372 new developments that favored his case, until administrative finality is reached and perhaps even after.
The agency that has a choice of misconduct charges, or involuntary retirement for psychiatric disability, nearly always opts for the former, and with good reason. A proposal along the latter line precipitates an embittered and costly struggle, which should be avoided when possible, in the interests of both sides. Most people can live easier with the idea they have committed misconduct than that they are psychiat-rically disabled, even when, in a pecuniary sense, the latter option would be preferable for them. Nor do they care to have their psyches examined by Government psychiatrists, not of their own choice. For this reason it appears to me that agency codes of conduct, and tables of penalties for misconduct, should generally 'be read as applicable to the prohibited conduct whether or not committed with mens rea The concept of mens rea should be confined to the criminal law, where it originated and where it belongs. Agencies confronted with irrational and self-defeating behavior on the job should not be judicially required to consider sua sponte whether it is due to psychiatric disability If the offending employee sets up psychiatric disability and offers to accept disability retirement in lieu of discharge, he should receive every consideration, and so far as I am aware, he usually does.
It seems to me that the very idea of disability in the Civil Service context, means inability to meet the physical or psychic requirements of the particular job, whatever they are. Should the agency have determined that plaintiff’s history made him unsuitable for re-employment, it could not consistently have refused him a disability retirement, in my judgment. This conclusion obtains even if the agency determined that plaintiff committed the offense stated in the charging letter, since the offense, as stated by it, was committed whether or not plaintiff was psychiatrically disabled. In short, the disability retirement, with annuity, appears to me to be the solution the Civil Service laws prescribe for instances where the employee has violated an agency regulation, but excusably because of his psychiatric condition. The extreme remedy of forcing him back to active duty is one the courts should shun whenever possible, as it assuredly will not *373 make for the efficiency of the service. This is not to say that in this case, at this time, a disability retirement is still a possible solution.
Among the members of our own bench, and I expect with others, the outcome one way or the other is seemingly viewed as morally wrong and leading to obnoxious consequences. The case is a polarizing one. My object in writing has been to point out that, even given the bizarre circumstances of this case, extreme positions were not, antecedently considered, necessary, and a reasonable intermediate solution was, ante-cedently considered, possible under existing law.