**Samuel C. WATHEN, Jr.**

v.

**The UNITED STATES.**

**No. 249–69.**

United States Court of Claims.

Dec. 17, 1975.

Rehearing Denied Jan. 30, 1976.

John I. Heise, Jr., Silver Spring, Md., attorney of record, for plaintiff.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and BENNETT, Judge.

OPINION

BENNETT, Judge:

Plaintiff, a former Internal Revenue agent and preference eligible veteran, seeks back pay and reinstatement asserting that both his removal from the service and a subsequent refusal of reemployment were contrary to law and void. This case, rather unusual on its facts, is before us on defendant's appeal from the opinion and conclusion of law by Trial Judge Philip R. Miller.[1]

At all relevant times prior to May 9, 1965, plaintiff was employed in Washington, D. C., in the National Office of the Internal Revenue Service, as a GS–12 tax law specialist. He was one of 10 agents in the Earnings and Profits Section, Corporation Tax Branch, Tax Rulings Division. In May 1965, plaintiff, age 41, had been separated from his wife for about 3 years, each having informal custody of two of their four children. A divorce was contemplated at such time as his wife's consent could be secured. For the prior 16 months, plaintiff and two of his children lived in Rockville, Maryland, with one Winifred O. McLaughlin, an Irish alien, whom plaintiff wished to marry as soon as feasible. Plans were made for a move to California, and to that end plaintiff had made application for a transfer to the IRS appellate division office located in San Francisco.

On Mother's Day, Sunday, May 9, 1965, at about 3 p. m., plaintiff and Miss McLaughlin set out by car for Friendship Airport, near Baltimore, Maryland, where she was to depart for San Francisco alone. While the car was on the Capital Beltway in Silver Spring, Maryland, for unknown reasons an altercation took place between them. They left the car, whereupon plaintiff seized a 4-barreled Derringer and killed her with two shots as she sought to flee across the Sligo Creek golf course.

At the scene, Montgomery County police arrested plaintiff, pistol in hand, who offered no resistance. The slaying was witnessed by passing motorists. Authorities placed a charge of murder against Mr. Wathen and held him without bond at the Montgomery County jail. Sensational, front-page publicity ensued. No fewer than five articles in three Washington, D. C., newspapers appeared shortly after the shooting, two of which exhibited a picture of plaintiff and victim and all of which highlighted his employment as an Internal Revenue agent. There was trial testimony by IRS personnel to the effect that accounts were carried on local radio and television news programs. IRS officials assigned a special inspector to ascertain the facts.

Under date of May 11, 1965, the inspector filed his report reciting that the Chief of Detectives of the Montgomery County Police Department had advised that Mr. Wathen had been arrested and charged with Miss McLaughlin's murder and that he was currently being held without bond. On the same day the Director of the Tax Rulings Division, Internal Revenue Service, notified plaintiff by letter of proposed adverse action, namely, suspension from duty without pay in order to promote the efficiency of the service pending further investigation and adjudication.[2] Plaintiff was repre-

---

1. We adopt by reference all of the findings of the trial judge, no exceptions having been taken to them by either party. The findings, which have been furnished to the parties, are not reprinted here as those necessary to the decision are included in the opinion. We reverse his conclusion of law and hold for defendant.

2. The Lloyd-LaFollette Act, 5 U.S.C. § 652 (1964), provides, in pertinent part:

"No person in the classified civil service of the United States shall be removed or suspended without pay therefrom except for such cause as will promote the efficiency of such service and for reasons given in writing. * * * *." The Veterans Preference Act of

sented by a lawyer at the time but no papers were filed opposing such proposed action. Effective May 18, 1965, plaintiff was suspended without pay. The record shows that the suspension was based upon the fact that plaintiff had been arrested and charged with murder.

On May 14, 1965, the Director, Tax Rulings Division, again wrote to plaintiff informing him of further proposed adverse action. In this letter the Director undertook to initiate removal proceedings, and we deem the precise wording of the charge and specification to be sufficiently important to set it out in full below.[3] To us it is clear that while the *suspension* was premised upon plaintiff's arrest, the charge resulting in *removal* was bottomed on the fatal shooting of Miss McLaughlin.

In due course the time allotted for plaintiff's reply ran out with no response by him to the notice of removal. By letter of June 4, 1965, the IRS notified him of his removal from the service based on the evidence of record as of that date. Such removal actually took effect June 18, 1965. It appears that the record evidence before the agency at the time consisted of the investigative report previously discussed and the media accounts referred to in the testimony, including the various newspaper articles.

The notification of personnel action effecting plaintiff's removal stated that it was "because of misconduct which brought discredit upon the Internal Revenue Service, namely committing homicide." It was a considered decision of plaintiff and his then counsel not to respond to the IRS charges while the criminal case was pending.

A Maryland grand jury on June 8, 1965, returned a true bill against plaintiff indicting him for the murder of Miss McLaughlin. At the arraignment on June 23, 1965, a plea of not guilty by reason of insanity was entered, and shortly thereafter the Montgomery County, Maryland, circuit court ordered appropriate psychiatric and psychological examinations. Extensive testing and evaluation followed. It was determined that at the time of the homicide, plaintiff did not know the nature and consequences of his acts nor the difference between right and wrong. The state confessed plaintiff's plea of not guilty. Plaintiff was acquitted of the criminal charge.

The expert testimony at plaintiff's murder trial did not warrant a finding, however, that he was then totally recovered from temporary insanity. Accordingly, the court entered its order of commitment, and plaintiff was remanded to the custody of the Springfield State Hos-

1944, 5 U.S.C. § 863 (1964) [now 5 U.S.C. §§ 3315, 7512, 7701], provides, in part:

"No permanent or indefinite preference eligible, who has completed a probationary or trial period employed in the civil service, or in any establishment, agency, bureau, administration, project, or department, hereinbefore referred to shall be discharged, suspended for more than thirty days, furloughed without pay, reduced in rank or compensation, or debarred for future appointment except for such cause as will promote the efficiency of the service and for reasons given in writing, * * *."

**3.** "It is proposed in order to promote the efficiency of the Internal Revenue Service, to remove you from the Service, in not less than thirty (30) calendar days from the date you receive this notice on the basis of the following charge:

"*Charge*: Violation of Section 1941.4 of the 'Rules of Conduct for Internal Revenue Service Employees' (Revised October 1963).

"(Section 1941.4 states, in part: 'The effectiveness of the Revenue Service in serving the public interest depends upon the extent to which the Service and it's [sic] employees hold the confidence and esteem of the Nation's citizens. This means that each employee must do his part to maintain this confidence and esteem * * *; by conducting himself during and outside working hours in a manner which will bring credit upon the Service; and by observing the spirit, as well as the letter, of the laws and regulations, and Revenue Service and Treasury Department requirements governing employee conduct. Employees whose conduct does not conform to the rules may be removed from the Service or may be the subject of other disciplinary action.')

"*Specification*: On Sunday, May 9, 1965, you conducted yourself in a manner which brought discredit upon the Internal Revenue Service by fatally shooting Miss Winifred O. McLaughlin."

pital, where he remained under treatment from December 8, 1965, until March 29, 1966. On the latter date, the Maryland circuit court once again considered plaintiff's status, this time with the assistance of a jury. The state's medical witness at this trial—the only medical witness—gave it as his opinion that plaintiff was not then insane and had not been insane at any time during his period of hospitalization. The court declared plaintiff sane, and he was released from custody on the same day.

On April 6, 1966, plaintiff presented himself for duty in the Personnel Division of the Internal Revenue Service.[4] He was then advised that consideration of his restoration to duty could be accomplished only by perfecting a written appeal. For that purpose plaintiff retained counsel who filed the necessary papers. The agency declined to act, noting on June 2, 1966, that plaintiff's appeal was out of time. This action was subsequently approved both by the Civil Service Commission Appeals Examining Office and the Board of Appeals and Review, neither of which reached the merits of the charge and specification on the basis of which plaintiff had been removed for the efficiency of the service.

At this stage plaintiff, by counsel, determined to appeal directly to the Civil Service Commissioners themselves, in a final effort to secure reopening and review on the merits of his removal. By letter dated May 24, 1967, this request

was allowed, and the case was returned to the Appeals Examining Office for further development and a new adjudication on the merits. Counsel for the agency and for plaintiff agreed that the case would be submitted on written memoranda without oral hearing.

The submissions to the Appeals Examining Office in plaintiff's behalf included the docket entries of his criminal trial and of the civil proceeding leading to his release from custody. Government counsel adduced no investigative reports, but appended to its papers photocopies of the five clippings from three area newspapers which were published shortly after the shooting.

On April 4, 1968, the Chief of the Appeals Examining Office notified plaintiff of his decision sustaining the removal action of the IRS. The letter opinion found the procedures followed to have been in order, and approved the view on the merits that plaintiff had been removed for such cause as would promote the efficiency of the service.[5] On June 28, 1968, the Board of Appeals and Review affirmed this disposition, and in December of that year the Commissioners declined to reopen the case on plaintiff's request. A petition was filed in this court on May 22, 1969. Plaintiff has been privately employed since his release from custody. Evidence adduced at the trial of the instant claim satisfies us that however impaired plaintiff's mental con-

4. Thus, plaintiff returned to his former employer seeking reinstatement less than 1 year after Miss McLaughlin's death. His claim for back pay and reinstatement is for the period from April 6, 1966, which he now represents is the date he was ready, willing, and able to resume work for IRS.

5. The opinion states in part:

"* * * The removal action against the appellant is based upon the fact that he did kill a human being and this act of killing violates standards of conduct required for retention on the rolls of the Internal Revenue Service.

\* \* \* \* \* \*

"As noted hereinbefore, there is no allegation in the record that the killing of this hu-

man being was done pursuant to authority of law or in self defense. In no sense then can it be a justifiable homicide as attorney for the appellant states. The situation requires no long discussion. The fact of the matter is that an Internal Revenue Agent has killed a human being, and has only escaped punishment by virtue of a plea of insanity. It is a simple conclusion of fact that the unjustified killing of a human being is inconsistent with the standards of conduct for employees in the Federal Service regardless of the state of their mind at the time the killing was committed. Therefore, we find the appellant's removal was for a cause which promotes the efficiency of the service."

dition was at the time of the slaying, he is now recovered.

## I

Plaintiff, through skilled counsel, has made a determined effort here to convince us that we should decide whether he was discharged for such cause as will promote the efficiency of the service. Thus, we are invited to examine the merits of the removal action. Before the precise questions for decision can be delimited, therefore, we must take care to outline the proper scope of judicial review in this case.

 It is long settled that this court limits its review of the administrative action in civilian pay cases to a determination of whether the adverse action disclosed by the administrative record or by a *de novo* trial, or both, is illegal because it violates applicable statutes or regulations, or is demonstrably in bad faith or malicious because it is arbitrary, capricious, or devoid of substantial evidence to support it. Good faith of those taking administrative action is presumed. *Boyle v. United States,* 515 F.2d 1397, 207 Ct.Cl. 27 (1975); *Holman v. United States,* 383 F.2d 411, 181 Ct.Cl. 1 (1967); *Finn v. United States,* 152 Ct.Cl. 1 (1961); *Croghan v. United States,* 89 F.Supp. 1002, 116 Ct.Cl. 577, *cert. denied,* 340 U.S. 854, 71 S.Ct. 71, 95 L.Ed. 626 (1950). We have stopped short of approaching the merits of such administrative personnel actions, recognizing that the subject is a matter committed to the discretion of the agency involved:

> Whether a person's discharge will promote the efficiency of the service is an administrative decision to be determined within the discretion of the agency, and no court has power to review the action, if taken in good faith. *Brownell v. United States,* 164 Ct.Cl. 406, 408–09 (1964); *Gadsden v. United States,* 111 Ct.Cl. 487, 489, 78 F.Supp. 126 (1948). * * *. [*Schlegel v. United States,* 189 Ct.Cl. 30, 40, 416 F.2d 1372, 1378 (1969), *cert. denied,* 397 U.S. 1039, [90 S.Ct. 1359, 25 L.Ed.2d 650] (1970).]

In *Schlegel* the court sitting *en banc* distinguished the facts but declined to approve the view of a divided panel of the United States Court of Appeals for the District of Columbia Circuit, as embodied in *Norton v. Macy,* 135 U.S.App. D.C. 214, 417 F.2d 1161 (1969). In the latter case there is some language indicating that a court might review a removal to ascertain whether the cause giving rise to such adverse action is rationally related to the efficiency of the service. 417 F.2d at 1164. That case did not involve homicide. We think that the dissenting opinion of Judge Tamm more accurately reflects the present state of the law, certainly as it is set down in our own decisions. In a more recent case, speaking for the majority, Judge Tamm wrote that where manslaughter was involved or any case involving charges of serious criminal conduct, the nexus may be presumed between the offense and the removal, between the regulation as applied and the statutory standard permitting removal for the efficiency of the service, and that the reviewing courts should not disturb the discretionary determinations of the agency charged by Congress with primary responsibility in this area. He said, "In all cases involving criminal conduct, the reviewing courts have uniformly upheld the dismissals as promoting the efficiency of the service." *Gueory v. Hampton,* 167 U.S.App.D.C. 1, 510 F.2d 1222, 1226 (1974).

 In our estimation the agencies and the Civil Service Commission are far better equipped and in a better position to make these sensitive judgments of whether and how a discharge promotes efficiency of the service. It is their prerogative, not ours, to do so. We do not think that we should lightly substitute judicial oversight for that of the executive branch in an area where practical considerations of administration and experience should be paramount and where the executive's prerogative and responsibility is to take expeditious action to insure the efficiency and discipline of the huge federal bureaucracy in the interests

of good government.[6] As Chief Judge Jones once put it (*Finn v. United States,* 152 Ct.Cl. 1, 7 (1961)):

> \* \* \* it is \* \* \* not within our province to pass on the question whether the plaintiff should or should not be employed. *Wittner v. United States* [76 F.Supp. 110] 110 Ct.Cl. 231. In that case the court said at p. 235 the following:
>
>> We are not authorized to determine whether a particular veteran should be employed. \* \* \*. Nor are we concerned with whether an employee should be discharged. That is properly in the hands of the affected department. \* \* \*.

*Accord: Crowley v. United States,* Ct. Cl., 527 F.2d 1176 (1975); *Charley v. United States,* 208 Ct.Cl. —— (1975); *Saracena v. United States,* 508 F.2d 1333, 206 Ct.Cl. 90 (1975); *Greenway v. United States,* 175 Ct.Cl. 350, *cert. denied,* 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966); *Harrington v. United States,* 174 Ct.Cl. 1110, 1117 (1966); *Knotts v. United States,* 121 F.Supp. 630, 128 Ct.Cl. 489 (1954).

■ As shown by all the foregoing authorities, and by many others which could be cited—for our experience with adverse actions in personnel cases is considerable—we have consistently interpreted determinations of what will promote the efficiency of the service under the Lloyd-LaFollette Act and the Veterans' Preference Act (note 2) as discretionary with the employing agency officials and the Civil Service Commission. As stated above, the proper and historic scope of our consideration is to test whether such determinations are in good faith and supported by substantial evidence, or whether void because arbitrary, capricious, malicious or in bad faith, in excess of legal authority or in violation of statutes and regulations. Plaintiff must overcome the presumption of good faith on the part of the administrative officers. It requires almost irrefragable proof to demonstrate abuse of discretion sufficient to overcome the presumption. It is not even necessary that the court find that the agency construction is the only reasonable one or that it is the result the court would have reached had the question been permitted to arise in the first instance in judicial proceedings. It is enough if the decision has a rational basis by the standards enunciated and in the case law relied on here. Accordingly, we do not decide whether this legally faultless killing amounts to such cause for removal as will promote the efficiency of the service. That is not our function.

## II

Thus, having charted the appropriate bounds of our review by reference to time-honored guidelines, we turn to the

---

6. "In the present case, the Government's interest, and hence the public's interest, is the maintenance of employee efficiency and discipline. Such factors are essential if the Government is to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency. Moreover, a requirement of a prior evidentiary hearing would impose additional administrative costs, create delay, and deter warranted discharges. Thus, the Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial [footnote omitted]." [*Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring opinion).]

See also *Bowman Transp. Co. v. Arkansas-Best Freight Sys.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), which, while not a personnel case—as are other cases relied upon herein and decided both by the Supreme Court and this court—nevertheless states a similar rule for review in district court actions under the Administrative Procedure Act, 5 U.S.C. § 706 (1970). The APA, of course, does not govern jurisdiction in the Court of Claims. *McGrath v. United States,* Ct.Cl.No. 17–75, 521 F.2d 1406, 207 Ct.Cl. —— (order, June 20, 1975).

questions for decision. We are first required to decide whether plaintiff's *removal* from the service on the basis of the charge and specification against him was in good faith or was arbitrary, capricious, or unsupported by substantial evidence.[7]

It will be recalled that the specification embodied in the letter of proposed removal delivered to plaintiff alleged that on May 9, 1965, he "brought discredit on the Internal Revenue Service by fatally shooting Miss Winifred O. McLaughlin." In order to overturn the adverse adjudication, plaintiff might therefore demonstrate that the agency did not possess substantial evidence to support either or both of two findings: (1) that plaintiff fatally shot Miss McLaughlin, or (2) that plaintiff brought discredit upon the Internal Revenue Service.

 At the time plaintiff was first notified of his removal, June 4, 1965, the evidence consisted of newspaper accounts and the investigative report. The agency must have considered such evidence, at least in part for the truth of the matter asserted therein, namely, that plaintiff fatally shot Miss McLaughlin. To this extent the evidence was entirely hearsay in the classic sense. Fed.R. Evidence 801(c). It cannot be denied, however, that hearsay can be substantial evidence to support an administrative adjudication. *McKee v. United States*, 500 F.2d 525, 205 Ct.Cl. 303 (1974); *Jacobowitz v. United States*, 424 F.2d 555, 191 Ct.Cl. 444 (1970); *Peters v. United States*, 408 F.2d 719, 722–23, 187 Ct.Cl. 63, 70–71 (1969). The Supreme Court has approved this rule. *Richardson v. Perales*, 402 U.S. 389, 401–02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

The IRS was, therefore, confronted with the hearsay recitals of area newspapers and the investigative report of plaintiff's arrest. In view of the number of newspapers which carried the story we think that insofar as they reported the fact of a shooting, resulting in death

observed by witnesses, they provided reliable and substantial evidence. The arrest itself, although as noted it did not form the basis of the removal action, provided further evidence of the fact of homicide. There was substantial, corroborated evidence, albeit hearsay, as of June 4, 1965, to support the conclusion of a reasonable mind and the administrative finding that plaintiff in fact shot his mistress to death. He did not then and does not now deny that the shooting took place.

 We next inquire whether the evidence of record on June 4, 1965, was substantial evidence to support a finding that the shooting brought discredit on the Internal Revenue Service. We think it was. To this extent the newspaper articles were not hearsay, since the truth of their content has no bearing on the question of whether the agency was discredited. The mere existence of such accounts, including as they did pictures of plaintiff and his victim and headlines emphasizing his employment with IRS, was substantial evidence from which the agency, and ultimately the Civil Service Commission, were entitled in their discretion to conclude that plaintiff's conduct brought discredit upon his employer. Therefore, on both issues—the fact of the shooting and consequent discredit to IRS—the record exhibits substantial evidence. Reasonable minds could accept such evidence as adequate to support the stated conclusions at the time they were made. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed.2d 126 (1938); *Jacobowitz v. United States, supra*, 424 F.2d at 561, 191 Ct.Cl. at 456.

 The only other allegation of error germane to the removal which merits discussion is the implicit assertion that IRS acted arbitrarily, capriciously, or in a manner abusive of its discretion in peremptorily effecting plaintiff's removal before his indictment or trial in the Maryland courts. We have approved the administrative practice of deferring post-

---

7. Plaintiff has not relied on violation of statutes or applicable procedural regulations.

suspension action on proposed final removal from federal employment until the conclusion of criminal proceedings, particularly where the allegations giving rise to the prosecution also constitute the specifications in the adverse personnel action. *Peden v. United States,* 512 F.2d 1099, 206 Ct.Cl. 329 (1975); *Cohen v. United States,* 369 F.2d 976, 177 Ct.Cl. 599 (1966), *cert. denied,* 387 U.S. 917, 87 S.Ct. 2029, 18 L.Ed.2d 969 (1967). But, we have never been of the opinion that such a course must invariably be followed in the good faith exercise of sound discretion or that our scope of review could require it. Where authorized officials find themselves possessed of substantial evidence tending to prove both the fatal shooting of another by an employee and consequent immediate discredit to the service through publicity of such conduct, all tending to impair public confidence in violation of the agency's Rules of Conduct (see note 3), without prejudice to other proper procedures, it is entirely permissible in the agency's discretion to effect prompt removal based upon such then-available substantial evidence of record. In *Holman v. United States, supra,* plaintiff was removed from his position in 1963 for an alleged immoral act for which he was acquitted in a criminal court in 1966. The court said that the acquittal did not require the conclusion that his separation from Government service was arbitrary. Plaintiff was also removed before ac-

quittal in *Prater v. United States,* 172 Ct.Cl. 608 (1965); *Croghan v. United States, supra,* and in other cases. Compare the quote supporting expeditious action in *Arnett v. Kennedy,* note 6. Such action, of course, is subject always to the corresponding privilege of the aggrieved former employee to apply for reinstatement and to exhaust such rights of administrative appeal as are afforded by applicable statutes and regulations.[8] A similar procedure was followed in plaintiff's case. On final discretionary consideration by the Civil Service Commissioners, his case was reopened and remanded to the Appeals Examining Office for adjudication on the merits. In the circumstances, we are not prepared to say that the record shows excessively precipitous action which is arbitrary, capricious, or an abuse of agency discretion requiring our disapproval.[9]

■ Plaintiff, however, asserts that public image considerations are not a sufficient basis for discharging an employee who is without fault. But, fault may be in the eye of the beholder. The federal employee is on notice that he must maintain a good public image. Plaintiff was on notice of his agency's rules which provided for adverse action against an employee whose conduct might subject the agency to public criticism for keeping on the payroll a person under suspicion of murder or any other crime. IRS was especially sensitive be-

---

8. The propriety of this approach is confirmed by Section 14 of the Veterans Preference Act of 1944, now codified at 5 U.S.C. § 7512(b)(1) (1970):

"(b) A preference eligible employee against whom adverse action is proposed is entitled to—

"(1) at least 30 days' advance written notice, *except when there is reasonable cause to believe him guilty of a crime for which a sentence of imprisonment can be imposed,* stating any and all reasons, specifically and in detail, for the proposed action; * * *." [Emphasis supplied.]

*See also* 5 C.F.R. § 752.202(c)(2) (1975) to the same effect.

9. Even if we entertained the view that the swiftness of the removal was error, which of course we do not, such error would be harmless. To sustain a recovery based upon administrative impropriety a plaintiff must demonstrate the manner in which he has been prejudiced thereby. *Hart v. United States,* 498 F.2d 1405, 204 Ct.Cl. 925, *cert. denied,* 419 U.S. 1049, 95 S.Ct. 624, 42 L.Ed.2d 643 (1974); *Haynes v. United States,* 418 F.2d 1380, 190 Ct.Cl. 9 (1969); *Cohen v. United States,* 369 F.2d 976, 177 Ct.Cl. 599 (1966), *cert. denied,* 387 U.S. 917, 87 S.Ct. 2029, 18 L.Ed.2d 969 (1967). Plaintiff lost no additional salary because of removal, for he had already been suspended without pay. Moreover, plaintiff did ultimately secure review on the merits before the Civil Service Commission.

cause of its need to maintain public confidence in its image of integrity, depending as it does essentially on voluntary compliance of the public. *Hoover v. United States*, 513 F.2d 603, 206 Ct.Cl. 640 (1975); *Birnholz v. United States*, 199 Ct.Cl. 532, 537 (1972). It was the thrust of the testimony of plaintiff's supervisor that any scandal involving an IRS employee impaired the integrity of the office. Like Caesar's wife, IRS employees are supposed to be above suspicion. In its discretion that agency is entitled to act with promptness in maintaining the efficiency of the service by such disciplinary actions as will maintain public confidence. This concept is explicit in the Foreword (by the Commissioner of Internal Revenue) to the Rules of Conduct for Internal Revenue Service Employees (Rev. 10–63), which states in part:

> * * * We can maintain public confidence only to the extent that every one of our contacts with the public reflects the highest ethical and moral standards.
>
> In addition to our daily assigned tasks, each of us has an important public relations role to play. Not only must we act with complete propriety, but we must be sure that none of our actions can be interpreted otherwise. * * *.

Section 1941.4 of the Rules has heretofore been quoted in footnote 3 and was included in the charge against plaintiff by his agency. It, too, emphasizes the importance of maintaining public confidence in the agency through conduct which will bring credit, not discredit, upon the Internal Revenue Service, with removal from employment a possible sanction for failure to behave both outside and during working hours in a manner above reproach. Additionally, 5 C.F.R. § 735.209 (1975) provides:

> An employee shall not engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government.

Surely plaintiff's conduct, however legally faultless, could in the agency's discretion be found to have run afoul of these admonitions against bad public relations and notoriously disgraceful conduct prejudicial to the Government and falling short of the highest moral standards. It would be a curious thing indeed if just because a state's attorney declined to prosecute a homicide the IRS would be deprived of its right and duty to enforce its own published rules and regulations for employee conduct. It would be more curious still if, indulging in the luxury of hindsight and speculation, this court should enforce such a result by concluding that had the IRS known that the state's attorney would not press the indictment and that the court would acquit plaintiff on insanity grounds, that the IRS would not have enforced its rules which implicitly mandate speedy action to accomplish their plainly stated purposes which are altogether unrelated to the merits of a criminal charge or defense thereto. *Croghan v. United States, supra,* 89 F.Supp. at 1004, 116 Ct.Cl. at 586. Further, to argue that the better practice would have been for IRS to have withheld action on the removal until the criminal case was concluded does not give the court authority to so require it in the face of rules, regulations, and statutes which seem to contemplate otherwise and where the agency's discretion is not shown to have been abused or based on insubstantial evidence in applying those restrictions.

### III

Next we consider whether the refusal of IRS to reinstate plaintiff upon his return and after acquittal by reason of insanity is legally wanting. Once again we do not decide the merits of the agency's decision to decline reemployment. In cases such as this whether plaintiff should be employed by the Government is no concern of the judicial department.

Our attention has been directed to Federal Personnel Manual, Chapter

306, Subchapter 5–2 (1969), where it is said:

> As a general rule, a history of mental illness is not disqualifying for Federal employment provided that recovery has been certified by competent medical authority and the applicants are capable of performing the duties of the position without hazard to themselves or others * * *.

Thus, prior mental illness bars neither initial employment with the Government nor reinstatement, so long as the impediment to health has been removed. That is not to say by any means, however, that a victim of prior mental illness *must* be restored to duty. We have held time and again that acquittal of a criminal charge does not erect a bar to adverse action in respect of one's federal employment. *Holman v. United States, supra; Prater v. United States, supra; Finn v. United States, supra; Bryant v. United States,* 122 Ct.Cl. 460 (1952), *cert. denied,* 344 U.S. 913, 73 S.Ct. 335, 97 L.Ed. 704 (1953); *Croghan v. United States, supra.* By analogy, acquittal of a criminal charge based upon a plea of legal insanity does not bar the employing agency from denying reinstatement, where such denial violates no statute or regulation and is neither arbitrary, capricious, nor an abuse of discretion.[10]

▄▄▄ On the record before us we cannot say that the agency erroneously rejected plaintiff's bid for his former job. Having initially removed him in a legally proper manner in view of what it in good faith judged to be such cause as would promote the efficiency of the service, the agency acted within permissible limits in requiring plaintiff to pursue the matter of his removal before the Civil Service Commission. IRS apparently took the position that if in view of

new evidence the removal fell, so *too* would its decision not to reinstate. We are unable to perceive the slightest impropriety in such a procedure. On the contrary—we think it to have been eminently fair. The extensive administrative record has been supplemented by a 3-day trial in court, by detailed findings, and close attention by the trial judge and this appellate panel to the procedures followed in plaintiff's removal.

## IV

Plaintiff's removal from office was based upon substantial evidence and was neither arbitrary nor capricious. We find no legal fault with the decision of IRS and CSC not to reinstate him. Accordingly, the plaintiff is not entitled to recover.

▄▄▄ The core of plaintiff's case is his belief that it is unjust to deprive a man of his job who was not responsible for the act giving rise to the removal and that there is no nexus between his offense and removal. In keeping with settled principles of law we have declined to base this opinion on the debatable question of whether this killing, faultless in legal contemplation, may be deemed such cause for removal as promotes the efficiency of the service. "It is not within the jurisdiction of the court to inquire into the guilt or innocence of the plaintiff as to the charges upon which he was removed from office." *Golding v. United States,* 78 Ct.Cl. 682, 685, *cert. denied,* 292 U.S. 643, 54 S.Ct. 776, 78 L.Ed. 1494 (1934). The wisdom of such a long-standing judicial position is evident, although on the facts of this case it would not be difficult to reach such a tempting conclusion. But, to assume jurisdiction to second-guess the administrators on what is best for efficiency of

---

**10.** *See* 5 U.S.C. § 3315 (1970):

"(a) A preference eligible who has been separated or furloughed without delinquency or misconduct, on request, is entitled to have his name placed on appropriate registers and employment lists for every position for which his qualifications have been established, * * *.

"(b) The Commission *may* declare a preference eligible who has been separated or furloughed without pay under section 7512 of this title to be entitled to the benefits of subsection (a) of this section." [Emphasis supplied.]

the service treads on dangerous ground. Such perplexing questions are better resolved at the administrative level, according to the tenor of our prior decisions respecting the separation of powers. It is the unquestioned right of the executive to select employees in that department. Further, as held by the Supreme Court in an opinion by Mr. Chief Justice Taft in the landmark case of *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1920); *Keim v. United States,* 177 U.S. 290, 20 S.Ct. 574, 44 L.Ed. 774 (1900); *Radford v. United States,* 264 F.2d 709, 710 (5th Cir. 1959); *Morelli v. United States,* 177 Ct.Cl. 848, 858 (1966). The appropriate penalty to impose upon an employee for infraction of an agency's rules is within the discretion of the agency subject to review on the merits by the Civil Service Commission, as in this case, and subject to judicial review on a more limited basis for procedural regularity and abuse of administrative discretion and bad faith. *Hoover v. United States, supra; Grover v. United States,* 200 Ct.Cl. 337, 353 (1973); *Liotta v. United States,* 174 Ct.Cl. 91, 96 (1966); *De Nigris v. United States,* 169 Ct.Cl. 619, 625 (1965). We decline the invitation in this case to abandon long-established precedents and make bad law. The petition must be dismissed.

*It is so ordered.*

LARAMORE, Senior Judge (dissenting):

The facts of this case are concededly grotesque. As the majority views the unhappy events:

On Mother's Day, Sunday, May 9, 1965, * * * plaintiff and Miss McLaughlin set out by car * * *. [F]or unknown reasons an altercation took place between them. They left the car, whereupon plaintiff seized a 4-barreled Derringer and killed her with two shots as she sought to flee * * *.

Plaintiff, a veterans' preference eligible, was at this time employed by the Internal Revenue Service. Charged with murder, he was found by a Maryland state court to have been not guilty by reason of insanity. Since that time, however, a jury in a later proceeding found that plaintiff has regained his sanity. He now seeks reinstatement to his former position with back pay.

The majority goes to great pains to demonstrate that this is a case easily decided. But my brothers rely upon the emotional appeal of the facts and a conception of judicial review of administrative action—which, in my judgment, no longer prevails—to cloak this court's responsibility to dispassionately resolve the issues.

While in this case a potentially unpopular result renders this responsibility onerous, I must accept the burden and respectfully dissent.

I

Primarily, I cannot accept the standard of review which is being adopted today in the opinion of the majority. At one point my brothers quote part of a paragraph from *Schlegel v. United States,* 416 F.2d 1372, 1378, 189 Ct.Cl. 30, 40 (1969), *cert. denied,* 397 U.S. 1039, 90 S.Ct. 1359, 25 L.Ed.2d 650 (1970), for the proposition that this court has *no* role to play in determining whether or not there is a sufficient nexus between the removal of action under review and the efficiency of the service. Recitation of the full passage is necessary to demonstrate their mistaken reliance on the language quoted out of context (emphasis supplied to the portion omitted by the majority):

Whether a person's discharge will promote the efficiency of the service is an administrative decision to be determined within the discretion of the agency, and no court has power to review the action, if taken in good faith. *Brownell v. United States,* 164 Ct.Cl. 406, 408–409 (1964); *Gadsden v. United States,* 78 F.Supp. 126, 111 Ct.Cl. 487, 489 (1948). *At the trial of the instant case before Commissioner Stone, three of plaintiff's superiors offered testimony indicating that the*

*morale and efficiency of the office would have been affected by plaintiff's continued presence. This testimony, when coupled with the administrative determinations concerning efficiency of the service, constitutes convincing proof that plaintiff's removal promoted the efficiency of the service and eliminated plaintiff's detrimental influence on the efficiency of the service.*

Several observations concerning *Schlegel* are in order. First, as the emphasized language cited above makes clear, this court affirmatively agreed with the determination of the Civil Service Commission and blind reliance upon agency expertise was not utilized in that case. Before affirming the agency's decision, we satisfied ourselves that the removal promoted the efficiency of the service. Second, *Schlegel* expressly distinguished the facts of *Norton v. Macy*, 135 U.S. App.D.C. 214, 417 F.2d 1161 (1969). My reading of *Schlegel* leaves me perplexed as to the basis for the implicit conclusion by the court in the instant case that *Schlegel* disapproved the standard of review used in *Norton*. To the extent any disagreement may have been expressed in *Schlegel,* it concerned the substantive merits of the disputed discharge, rather than the standard of review. *Schlegel, supra,* 416 F.2d at 1378, 189 Ct.Cl. at 40–41.

It is true that at one time the prevailing view was to rely exclusively upon the expertise of administrative agencies for correct application of specialized statutes. *See, e. g., Gray v. Powell,* 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941). However, the advent of the Administrative Procedures Act[1] in 1946 precipitated an eventual shift in emphasis so that courts now have a responsibility to review even discretionary administrative action. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Ciambelli v. United States,* 198 Ct.Cl. 240 (1972). Acknowledging this, the majori-

ty, in this case, adopts "good faith" as its standard of review. And at certain points in its opinion the court appears to define a "good faith determination" in a manner which would preclude arbitrary and capricious action, a determination unsupported by substantial evidence or an action contrary to law. Yet, my brothers allude to those terms without any real attempt to apply their meaning. While the scope of review under these standards may indeed be narrow, this court has an important responsibility to determine whether a particular case falls within the narrow category of cases where it must determine that legal error has been committed.

The Supreme Court of the United States in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), has recently laid down the rule that, as a reviewing court, we must determine the legal framework within which administrative discretion is exercised:

Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must *"consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment * *.* Although this *inquiry into the facts is to be searching and careful,* the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. [814] at 824. *The agency must articulate a "rational connection between the facts found and the choice made." Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) * * *. [Emphasis supplied.]

*Bowman* states what I believe in this case to be the proper scope of our responsibility of review.

---

1. Act of June 11, 1946, 60 Stat. 237, as amended, 5 U.S.C. §§ 551 *et seq.,* and 702 *et seq.*

## II

I consider now the action taken by the agency which is at issue and additional reasons which compel me to voice my disapproval of the court's review. The court devotes substantially all of its discussion to the removal action by the Internal Revenue Service (IRS) on June 4, 1965, and the evidence adduced by the IRS at that time. Only one meager statement in the majority's opinion reveals that plaintiff's case was, in fact, reopened by the Civil Service Commission and remanded to their Appeals Examining Office (AEO) for a *new adjudication on the merits.* The reopening of the case for a decision on the merits, in my view, spares this court the necessity of having to decide whether the removal action taken by the IRS was improper. Instead, the action I would regard as coming under review is the notice of April 4, 1968, by the Chief of the AEO (affirmed by the full Board, by letter, on June 28, 1968), in which the plaintiff's removal was sustained.

Since the Civil Service Commission's decision of April 4 should have been the agency action primarily reviewed by this court, this court's review should have taken into account all of the evidence available to the Civil Service Commission at the time of his final action, and not merely the evidence adduced at the time of removal by the IRS. Moreover, in considering the issue of arbitrariness, the court may review all available evidence, including *de novo* evidence taken before one of our trial judges as well as the administrative record. *Schlegel v. United States, supra; Brown v. United States,* 396 F.2d 989, 184 Ct.Cl. 501 (1968).

It is beyond question that there has been at least a minimal showing, upon the record, that plaintiff's mental condition was impaired at the time he committed the act for which he was removed. The decision of the AEO on April 4 impliedly refers to this in stating that plaintiff's conduct was inconsistent with the proper standard of conduct for employees "regardless of their state of mind." Thus, plaintiff's state of mind was a factor taken into account by the AEO in passing upon the legal merits of plaintiff's discharge. In light of this, the decision of the AEO enunciates what, in my view, is an erroneous construction of the laws applicable to the facts of this case.

With respect to the legal merits, the April 4 decision stated, in pertinent part:

> * * * The fact of the matter is that an Internal Revenue Agent has killed a human being, and has only escaped punishment by virtue of a plea of insanity. *It is a simple conclusion of fact that the unjustified killing of a human being is inconsistent with the standard of conduct for employees in the Federal Service regardless of the state of their mind at the time the killing was committed.* Therefore, we find the appellant's removal was for a cause which promoted the efficiency of the service. [Emphasis supplied.]

And yet, both the IRS and the Civil Service Commission accept the view that mental illness is not a cause for removal or denial of reinstatement if the employee has recovered. The Civil Service Commission policy, set forth in Federal Personnel Manual, chapter 306, 5–2 (1969), is that, "as a general rule, a history of mental illness is not disqualifying for Federal employment provided that recovery has been certified by competent medical authority and the applicants are capable of performing the duties of the position without hazard to themselves or others * * *." Thus, subchapter 5–2 provides for initial employment and for reinstatement if the employee has previously been dismissed for reasons attributable to mental illness. *See Manzi v. United States,* 198 Ct.Cl. 489, 493–494 (1972). I think it odd that while cured mental illness is not disqualifying for Federal employment that an employee could still be subject to a disciplinary

dismissal for conduct resulting from such an illness.[2]

Plaintiff is entitled to the benefits of the Veterans' Preference Act of 1944, 5 U.S.C. §§ 3315, 7512, 7701, which was designed to confer a measure of additional job security on veterans not enjoyed by unprotected Federal employees. Insofar as Congress provided therein that an employee having such status may be dismissed "only for 'such cause as will promote the efficiency of the service,'" it plainly meant that "the employer agency must demonstrate some 'rational basis' for its conclusion that a discharge 'will promote the efficiency of the service.'" *Norton v. Macy, supra* at 1164. I believe it is not reasonable nor rational to construe the Rules of Conduct of IRS Employees to threaten sanctions for anything less than volitional or conscious behavior because there is no real deterrent purpose that can be served in a disciplinary removal when all the evidence points to lack of moral culpability. *Cf. Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). The Civil Service Commission's action in this case thus smacks of emotionalism rather than reasoned decision making.

Moreover, I do not believe, as the majority implies, that in enacting the Veterans' Preference Act of 1944, Congress intended to permit an agency to achieve the purpose of acquiring or maintaining a good public image at the price of dismissing veterans as disciplinary measures for conduct for which they may have been wholly without legal fault. I cannot, in good conscience, join the court today in holding that "fault may be in the eye of the beholder," for to do so would be taking away a good measure of the job protection that Congress sought to provide for veterans who have honor-ably served the country in and out of military uniform.

In summary, my view is that the Commission was under a clear legal misapprehension when it refused to consider the plaintiff's state of mind as bearing upon his legal and moral culpability. However, there is no need to remand this case to the Civil Service Commission because no exceptions were taken by either party to the factual findings of Trial Judge Miller, and the case is now one purely of applying the law to the findings. Two pivotal findings read as follows:

41. On May 8, 1965, at the time when plaintiff killed Miss Winifred O. McLaughlin, plaintiff was of such mental incapacity and reason so as not to be able to properly distinguish between right and wrong, nor to know the nature and consequences of his acts as applied to himself, and was not responsible for his actions.

42. On April 6, 1966, when plaintiff applied to IRS for reinstatement to the position from which he had been removed, and at all relevant times thereafter plaintiff was recovered from his mental illness, was of sound mind, did not represent a threat to the safety or property of others, and was fully able to perform the duties of such position.

On this basis, I would find that the Civil Service Commission could not properly find that legal "cause" existed for plaintiff's removal for violating the Rules of Conduct of IRS Employees.[3]

However, with respect to the question of reinstatement, I concur with the majority because, under the jurisdictional act of this court, restoration is discretionary.

---

2. There is no doubt that the charge upon which plaintiff's dismissal was based was a disciplinary one because it was based purely on plaintiff's past conduct and not his inability to perform in the future.

3. This proceeding involves questions of exceptional importance and difficulty, and since the opinion of the court, in my judgment, seems to depart from prior decisions with respect to the question of our scope of review, this case appears to be an appropriate candidate for rehearing en banc pursuant to Rule 7(b) or (d).

## ORDER DENYING REHEARING

This case comes before the court on plaintiff's motion, filed January 5, 1976, for rehearing *en banc* and motion for rehearing to reconsider judgment pursuant to Rules 7(d) and 151(b). Upon consideration thereof, together with the response in opposition thereto, without oral argument, by the seven active Judges of the court as to the suggestion for rehearing *en banc* under Rule 7(d), which suggestion is denied *, and further having been so considered by the panel listed above as to the motion for rehearing under Rule 151(b),

It is ordered that plaintiff's said motion for rehearing be and the same is denied **.

NICHOLS, *Judge* (concurring in the result).

Since I do not agree with statements in the majority opinion, yet have decided to vote against rehearing because I do agree with the result, I respectfully submit this statement of my views.

The Maryland court proceedings dealing with Mr. Wathen, as reported in the majority opinion, seem at first blush to furnish a prime example of the reasons why people are losing faith in our system of criminal justice, and must eventually subject it to sweeping reforms. However, the careful opinion and findings of Trial Judge Philip R. Miller, afford no basis to impugn the good faith of anyone concerned, or the legal correctness of the Maryland judicial rulings, or the professional competence of the psychiatrists who achieved, according to themselves, such an apparently miraculous cure. If defendant had offered evidence on these points we might have had a different case. There are limits to *res judicata* and collateral estoppel in cases, *e. g.*, of fraud on the court, but such issues do not confront us here. Though we are a society that recoils in horror against taking of life by the state, we treat such taking by anyone else as a very minor peccadillo. The fact remains, plaintiff has blood on his hands, and all the absolution the psychiatrists can offer will not suffice to wash it off.

The panel attacks its case the hard way by raising the vexed, but here I think moot, issue as to whether, or to what extent, an administrative decision that a removal will promote the efficiency of the service, is subject to judicial review. At one time I took issue with *Norton v. Macy*, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969), which innovated such review, believing it to be a judicial intrusion into an area reserved for executive discretion when it is a matter, at least, of deciding what kinds of behavior are detrimental to service interests. I am gratified to see others coming to my opinion, but I am no longer so sure of it myself. It is anomalous to have a single separate area of decision making excluded from judicial review when such exclusion is not based on express statutory provisions, absent here. When Congress desires to preclude judicial review it knows how to do it. *Chambers v. United States*, 451 F.2d 1045, 196 Ct.Cl. 186 (1971). However, judges must be careful not to presume automatically that their wisdom is superior. Running executive agencies is difficult enough even for those appointed to do so and in daily contact with the problems. Identification of service interests and weighing priorities with respect thereto are matters of high executive discretion. Where *Norton v. Macy* went wrong was in giving insufficient respect to the agency's ideas as to what was needed to maintain its efficiency, not in venturing on forbidden territory. Yet, particularly in the area of alleged off-duty misconduct, there can easily be, and in the past, have been, abuses of executive discretion in unreasonable efforts to regulate the off-duty behavior of Government employees.

In *Schlegel v. United States*, 416 F.2d 1372, 189 Ct.Cl. 30 (1969), *cert. denied,*

---

* DAVIS, *Judge*, dissents in that he would allow plaintiff's suggestion for rehearing *en banc* under Rule 7(d).

** LARAMORE, *Senior Judge*, dissents in that he would allow plaintiff's motion for rehearing to reconsider judgment under Rule 151(b).

397 U.S. 1039, 90 S.Ct. 1359, 25 L.Ed.2d 650 (1970), the court majority seemed to me to have it both ways, reviewing favorably the administrative determination of what was good for the service, while asserting it was immune from such review. It attempted to distinguish *Norton v. Macy* on the facts instead of disapproving it as I would have done. The panel majority here may be right as to the almost irrefragable proof required to overturn the executive decision, if you limit it to on-duty misconduct, yet be wrong as to off-duty misconduct.

The issue is moot, for me, in *Wathen's* case, because it is for me too plain for argument that it is not good for the Internal Revenue Service's efficiency to employ an agent with Mr. Wathen's history, *i. e.,* one who has taken life—even if only once—in a fit of dissociation when faced with apparently insurmountable stress and emotional trauma, has avoided (in the lawyer's dichotomy, I do not say evaded) the law's penalty for murder on the ground of insanity, and has won release shortly thereafter on the ground of being perfectly sane. Such people have their qualities, and there must be a niche for them somewhere, but surely not in the IRS! I cannot help asking how a taxpayer would like having Mr. Wathen call on him to audit his tax returns. Would he eye him for a suspicious bulge, or ask him to undergo a pat-down search? The dissent in this case is not written out of perfect faith in the psychiatrist's one in ten thousand estimate of the chances of a relapse, at the dissent's caveat against ordering reinstatement shows. But if Wathen should not be reinstated in 1976, how can the agency be faulted for not doing so in 1966?

The real question is whether the offense violated any regulation of the IRS. "Conduct to discredit" is a concept derived from military law. We know from *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), that it adequately describes a host of off-duty offenses. Testimony that the behavior actually lowered public esteem for the

agency, or did not, should not be required in every case. We know by the Maryland court decisions that Wathen was not guilty of murder. Our trial judge analyzes the holdings as indicating a lack of *mens rea* because of Wathen's temporary psychiatric condition, and he would read a *mens rea* requirement into the IRS regulation too. It is not correct to say that Wathen was exonerated of all legal fault. I do not think *mens rea* is required for a civil action for wrongful death. The Maryland courts did not have this issue before them. One could well suppose, and I do suppose, that Wathen may be or have been liable to the heirs or next of kin of his victim, Miss McLaughlin. The way the agency testified, and the way it framed its charges, it is clear it considered that homicide without *mens rea* was conduct to discredit. They would not properly apply it, of course, to a purely accidental homicide, free of all fault, but that is not this case, nor is a homicide in self-defense. It seems to me a perfectly rational application of the prohibition against conduct to discredit, to apply it to all homicides except those where the employee is or should be exonerated of legal fault, noting the difference between being without fault and without *mens rea.* In this case, so far as we know, he has never been exonerated of anything except the charge of murder, and he was exonerated of that on grounds, lack of *mens rea,* that would have no impact on civil liability.

By my analysis, therefore, the plaintiff is not aided by his acquittal and it may be moot whether the agency's case should be evaluated as it was when the plaintiff was dismissed, or as of the final stage of administrative review, as the dissent urges. As to this, if we must decide it, I agree with the dissent. We held in *Peden v. United States,* 512 F.2d 1099, 206 Ct.Cl. 329 (1975) that the agency could use as part of its "substantial evidence" at the hearing, newly discovered or newly available incriminating testimony the agency did not have when it terminated the plaintiff's employment.

It would seem to follow he should have a right to use new evidence or new developments that favored his case, until administrative finality is reached and perhaps even after.

The agency that has a choice of misconduct charges, or involuntary retirement for psychiatric disability, nearly always opts for the former, and with good reason. A proposal along the latter line precipitates an embittered and costly struggle, which should be avoided when possible, in the interests of both sides. Most people can live easier with the idea they have committed misconduct than that they are psychiatrically disabled, even when, in a pecuniary sense, the latter option would be preferable for them. Nor do they care to have their psyches examined by Government psychiatrists, not of their own choice. For this reason it appears to me that agency codes of conduct, and tables of penalties for misconduct, should generally be read as applicable to the prohibited conduct whether or not committed with *mens rea*. The concept of *mens rea* should be confined to the criminal law, where it originated and where it belongs. Agencies confronted with irrational and self-defeating behavior on the job should not be judicially required to consider *sua sponte* whether it is due to psychiatric disability. If the offending employee sets up psychiatric disability and offers to accept disability retirement in lieu of discharge, he should receive every consideration, and so far as I am aware, he usually does.

It seems to me that the very idea of disability in the Civil Service context, means inability to meet the physical or psychic requirements of the particular job, whatever they are. Should the agency have determined that plaintiff's history made him unsuitable for re-employment, it could not consistently have refused him a disability retirement, in my judgment. This conclusion obtains even if the agency determined that plaintiff committed the offense stated in the charging letter, since the offense, as stated by it, was committed whether or not plaintiff was psychiatrically disabled. In short, the disability retirement, with annuity, appears to me to be the solution the Civil Service laws prescribe for instances where the employee has violated an agency regulation, but excusably because of his psychiatric condition. The extreme remedy of forcing him back to active duty is one the courts should shun whenever possible, as it assuredly will not make for the efficiency of the service. This is not to say that in this case, at this time, a disability retirement is still a possible solution.

Among the members of our own bench, and I expect with others, the outcome one way or the other is seemingly viewed as morally wrong and leading to obnoxious consequences. The case is a polarizing one. My object in writing has been to point out that, even given the bizarre circumstances of this case, extreme positions were not, antecedently considered, necessary, and a reasonable intermediate solution was, antecedently considered, possible under existing law.