**Dr. Gary L. PEARSON, DVM**

v.

**The UNITED STATES.**

**No. 249–78.**

United States Claims Court.

Jan. 11, 1983.

Charles K. Dayton, Minneapolis, Minn., attorney of record for plaintiff.

Colvin W. Grannum, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. Ross W. Dembling, Dept. of Interior, Washington, D.C., of counsel.

## OPINION

YOCK, Judge:

This civilian pay case deals with the issue of whether the plaintiff, Dr. Gary L. Pearson, was improperly dismissed from his position in the United States Department of Interior, Fish and Wildlife Service. The plaintiff contends that his reassignment, and ultimate dismissal, was motivated by a desire on the part of his superiors to remove him from his job in North Dakota due to his free speech activities there on behalf of certain environmental interests.

The United States Civil Service Commission determined that the plaintiff's dismissal was proper. Plaintiff appealed that determination to the United States Court of Claims. Jurisdiction is founded on 28 U.S.C. § 1491 (1976).

The defendant initially moved for summary judgment in the Court of Claims. However, the appellate division of that Court denied the defendant's motion and remanded the case to the trial division (now the U.S. Claims Court) for further trial proceedings. For the reasons set forth below, it is concluded that the Civil Service Commission's decision affirming the plaintiff's dismissal was not arbitrary or capricious and was supported by substantial evidence. Therefore, the plaintiff's petition as to this claim (Counts I and II) must be dismissed.[1]

### Factual Background

The plaintiff, Gary L. Pearson, is a doctor of veterinary medicine (DVM), who currently resides in Jamestown, North Dakota. Dr. Pearson began working for the United States Department of Interior, Fish and Wildlife Service (Service) on April 10, 1967. He began working as a Research Veterinarian, Wildlife Disease Specialist at the Northern Prairie Wildlife Research Center (Jamestown Center) in Jamestown, North Dakota, which had been formed by the Service in 1965.

The Jamestown Center was established in North Dakota as the fourth major wildlife research center of the Division of Wildlife Research for the Service. The principal purposes of the Center were to conduct research on waterfowl and other migratory birds and their habitats, to guide management programs, to develop methods of control of nuisance birds and mammals, to study pesticide/wildlife relationships in the prairie pothole region, to study diseases and parasites of migratory game birds and develop methods of reducing losses from these causes, and to conduct socioeconomic investigation to determine the compatibility of various development programs with wildlife programs.

Plaintiff's position at the Jamestown Center included two major responsibilities. First, he was responsible for planning and conducting research concerning the pathological condition of wildlife species, primarily waterfowl. Second, he was to provide veterinary medicine support, including consultant services to other researchers at the Center, and monitor the health of the captive flocks.

When plaintiff accepted his position at the Center, he became the only wildlife disease specialist stationed there. However, he was assured by Mr. Harvey Nelson, the Director of the Center, that a disease research laboratory would be constructed and that additional staff and equipment would be added for the purpose of expanding the Center's Wildlife disease research program.

As a result of the Center's inability to obtain funds to expand its wildlife disease research program, this proposed laboratory was never constructed. The funding problems which prevented the Center from constructing a wildlife disease research laboratory significantly contributed to plaintiff's failure to develop adequately the wildlife disease research portion of his position at the Center. It also contributed greatly to the plaintiff's frustration at being unable to

---

1. By agreement of the parties, Dr. Pearson's claim for overtime pay (Count III) has been set aside for a subsequent hearing, both parties agreeing to the likelihood of settlement on this point.

completely perform his mission at the Center, and he communicated this frustration frequently to his superiors at the Center.

In July 1970, the Bear River Research Station located at Brigham City, Utah, was transferred from the supervision of the Denver Wildlife Research Center to the Jamestown Center. The Bear River Station was supervised by Dr. Wayne Jensen and was primarily responsible for research on waterfowl botulism, a waterfowl disease of considerable concern to the Service. Two other wildlife disease specialists, Dr. Malcolm McDonald and Ms. Ruth Duncan, were employed at the Bear River Station.

In 1969, several years after he moved to Jamestown to begin working at the Jamestown Center, Dr. Pearson became publicly involved in controversial local environmental issues. As the "issues chairman" of the Jamestown Chapter of the National Audubon Society (ENPRO) and later as vice president of that group, he conducted extensive correspondence on environmental issues with local newspapers and North Dakota officials. The plaintiff was opposed to certain federally-funded public projects to be located in North Dakota such as the Garrison Diversion Project, the Kindred Dam, the James River Barge Canal, the Starkweather Watershed, and the Omega Navigational Tower. The plaintiff expressed his personal and the Society's opposition to these projects in letters to the editor of the *Jamestown Sun,* which was the local newspaper. Four letters were published in the paper on October 18, 1969; October 27, 1969; November 29, 1969; and August 28, 1972. In addition, the plaintiff sent letters to Senator Milton R. Young, the senior Senator from North Dakota, explaining his views beginning on June 11, 1970. Senator Young was known as a strong proponent of the Garrison Diversion Project, which had been planned since the 1940's.

In April 1972, Dr. Charles Loveless, the Assistant Director for Research for the Fish and Wildlife Service in Washington, D.C., visited the Jamestown Center. While there, he met with Dr. Pearson for about an hour, during which time the plaintiff expressed his frustration about his inability to develop a wildlife disease program at the Jamestown Center as well as his concern about the lack of coordination within the Service disease program nationwide. On at least four occasions between April of 1972 and March 1973, the plaintiff sent memoranda directly to Dr. Loveless, Mr. Nelson's superior, expressing his belief that the Service wildlife disease program was not well-defined and lacked priorities.

On May 25, 1972, eight Service wildlife disease professionals, including the plaintiff, held a meeting in Denver, Colorado, to discuss the future direction of the wildlife disease program nationwide. Dr. Robert I. Smith, a research staff specialist from Washington, D.C., chaired the meeting. In a memorandum to the Washington office after the meeting, Dr. Smith noted that "after lengthy discussion it became clear that the group wanted a team approach in which they work together, preferably at a single location." On June 6, 1972, the plaintiff, who had consistently complained about the lack of a coherent disease research program, wrote Dr. Smith and concurred with the concept of a central location for wildlife disease specialists. In spite of this support for the concept, the plaintiff also emphasized that he had reservations about the central research center and he suggested that he "would find other employment" unless he was convinced that wildlife research could make a "positive contribution." In September 1972, Mr. Jerry Longcore, a staff specialist in Washington, assumed staff responsibility for the Migratory Bird Program including coordinating wildlife disease work from Dr. Smith. After reviewing Dr. Smith's memoranda and the other comments received, he initiated staff work to determine the extent of the Service's wildlife disease resources.

In January 1973, an outbreak of duck plague or duck virus enteritis occurred at the Lake Andes National Wildlife Refuge in South Dakota. During the outbreak, which ended in early March 1973, approximately 40,000 waterfowl died. The plaintiff was the first disease specialist on the scene. Dr.

Milton Friend from the Denver Wildlife Research Center and Dr. Louis Locke from the Patuxent Wildlife Research Center later joined him. Because of the severity and significance of the Lake Andes duck plague outbreak, some of the senior officials of the Service also visited Lake Andes. Consequently, the outbreak revitalized the on-going discussions within the Service regarding the merits of reorganizing and consolidating the wildlife disease program at one central location, instead of having the wildfowl disease specialists scattered around the nation at the various research centers and stations.

On March 12, 1973, Dr. Friend wrote a memorandum to the director of the Denver Center recommending reorganization of the wildlife disease program in order to combat duck plague. The recommendation called for the establishment of an emergency wildlife disease diagnostic team, which would include the plaintiff. Concurrently, the plaintiff was also attempting to stimulate some discussion relating to reorganizing the wildlife disease activities. The plaintiff suggested to his superiors in March of 1973 that there was a need to schedule a meeting between the disease specialists and the appropriate Service administrators.

As a result of these recommendations, a meeting was held at the Patuxent Research Center in Laurel, Maryland, on April 17 and 18, 1973. Most of the wildlife disease specialists who attended the May 25, 1972 meeting, including the plaintiff, were in attendance at this meeting. Additionally, several senior Service administrators, who had visited Lake Andes during the duck plague outbreak, attended the meeting. The minutes of this meeting indicated that all participants recommended that the Service wildlife disease personnel be physically located in one place, and be ready and able to react to a crisis anywhere in the United States.

Approximately two weeks later, on May 2, 1973, Dr. Friend completed and submitted to the Director of the Denver Center an unsolicited proposal entitled "A National Center for the Study of Diseases of Migratory Birds." A copy of this memorandum was sent to Dr. Pearson and the other wildlife disease specialists in the Service. In addition, the Director of the Denver Center sent a copy of the proposal to the Washington office indicating that he would strongly recommend "favorable consideration as soon as possible of Dr. Friend's proposal." Dr. Friend's detailed proposal suggested objectives and priorities for a consolidated wildlife disease program. The proposal's goal was to recommend development of "an internationally recognized National Center for the study of diseases." The document noted that "one of the first capacities necessary is a strong field diagnostic capacity." Dr. Friend identified nine professional positions from within the Service which would compose the diagnostic staff, including a "wildlife veterinarian (diagnostician)." Dr. Friend testified at the supplementary trial that at the time he drafted this proposal, he evaluated the Service wildlife disease specialists and considered the plaintiff the most qualified individual for the position of "wildlife veterinarian (diagnostician)."

About May 24, 1973, Mr. Harvey Nelson, who was the plaintiff's superior at the Jamestown Center, asked the plaintiff to prepare a memorandum outlining recommendations for establishing a minimum Service-wide diagnostic capability to be located at the Bear River Station. Mr. Nelson told plaintiff that if the program developed, the plaintiff would probably be transferred to it. The plaintiff submitted the requested memorandum on May 29, 1973, and his recommendations were based on the use of existing personnel and facilities. In this memorandum, the plaintiff acknowledged the need to upgrade and expand the Service's wildlife disease diagnostic capability stating: "the disease program of the BSFW [Service] today is characterized by a part-time diagnostic effort relegated to a low priority behind an equally inadequate research program."

On June 1, 1973, Mr. Nelson forwarded the plaintiff's memorandum and Dr.

Friend's proposals to Dr. Jensen at the Bear Island Station for his input in order to further evaluate the feasibility of a Service reorganization. After receiving Dr. Jensen's comments, Mr. Nelson sent a memorandum dated July 13, 1973 to Mr. Joseph Townsend, Acting Director of the Division of Wildlife Research in Washington, representing the Jamestown Center's viewpoint on the establishment of a centralized wildlife disease center at the Bear River Station. The memorandum expressed Mr. Nelson's endorsement for the project and his desire to discuss the details with him and his staff. In this memorandum, Mr. Nelson also made the first formal recommendation to transfer the plaintiff to the Bear River Station as Dr. Jensen's principal assistant. Subsequently, Mr. Nelson discussed the proposal with Mr. Longcore, Mr. Townsend, and Dr. Charles Loveless, who was the Assistant Director for Research at the Service in the Washington office. Mr. Nelson also discussed with Dr. Loveless his concern about the plaintiff's environmental activities and the difficulties that they were beginning to cause at the Jamestown Center.

In the late summer or fall of 1973, Dr. Charles Loveless, the Assistant Director for Research in the Washington central office, made a tentative decision to establish a consolidated wildlife disease program at the Bear River Station. The decision was made by Dr. Loveless after consulting with Mr. Joseph Townsend, Acting Chief of the Division of Wildlife Research, and after discussions with various other officials in the Service and after reading the various submitted proposals. This decision resulted in a budget document being sent to the Jamestown Center (the organizational parent of the Bear River Station) on November 8, 1973, which confirmed the consolidation and stated that an additional $100,000 was being allocated to the Center for duck plague research, for modification of the Bear River

Station facility to accommodate the research, and for the transfer of the plaintiff to Bear River. At this time, Dr. Loveless was aware that Dr. Pearson was involved in some controversial environmental matters in North Dakota and that this involvement was beginning to cause Mr. Nelson some difficulty.[2]

While these discussions were continuing within the Service on the centralization of the wildlife disease staff at one location, the plaintiff also continued his environmental activism in North Dakota. On May 21, 1973, written comments critical of the Federal Government's environmental impact statement for the Garrison Diversion Project were presented at a public hearing in Minot, North Dakota. These comments were signed and presented by the plaintiff as Issues Chairman of the Jamestown, North Dakota Chapter of the National Audubon Society (ENPRO), and not as a Federal Government employee.

In addition, on August 13, 1973, the plaintiff sent a letter to then Congressman Mark Andrews of North Dakota (now Senator) requesting responses to over 20 questions regarding the Garrison Diversion Project. Dissatisfied with the Congressman's reply, the plaintiff made similar demands to Senator Milton Young on September 29, 1973. This demand by the plaintiff signaled the beginning of another series of letters over the next several months between the plaintiff and the Senator. After receiving a number of letters from the plaintiff, Senator Young on November 13, 1973, wrote the following letter to Mr. Nelson:

Enclosed is a copy of the latest letter I have received from Dr. Gary L. Pearson and my reply.

Since he is quite a regular correspondent, I would be interested in knowing what

---

2. The August 5, 1976 decision by the Federal Employee Appeals Authority (FEAA) of the Civil Service Commission (CSC) found that Mr. Nelson's reassignment recommendation of Dr. Pearson to Bear River was partly motivated by the plaintiff's private environmental activities. However, it also found that Dr. Charles Love-

less, who actually made the decision to consolidate the Service's wildlife disease program at Bear River and to transfer Dr. Pearson to that new unit, was not so motivated, but simply made the decision in the interest of starting the process of consolidation of the entire disease research program within the Service.

his assignment is at the Northern Prairie Wildlife Research Center.[3]

Mr. Nelson responded to Senator Young's letter with his letter dated November 21, 1973:

In reply to your request of November 13, Dr. Gary L. Pearson is employed at the Center as a wildlife disease specialist. He is trained in veterinary medicine and microbiology. He does excellent work in these fields, but during the past four years has become more and more involved in local and regional environmental matters. In this regard he has developed strong personal relationships with our mutual critics, Dr. Glen Sherwood and Richard Madson. This has resulted in other confrontations concerning the position taken by the Bureau of Sport Fisheries and Wildlife on certain water development and resource management issues, and my direction of the research program at this Center.

I am sure you are familiar with Dr. Pearson's personal feeling about the Garrison Diversion Program and the frequent expression he makes through letters to editors in various North Dakota papers. This subject has been discussed with him insofar as BSFW policy is concerned but he has been careful to act as an individual. This is a difficult distinction to make, as I recently discussed with Herb Lyons. You may be interested in learning that we are presently in the process of reorganizing our migratory bird disease research activities as related to this Center and the Bear River Station at Brigham City, Utah. This has resulted largely because of the need to strengthen our diagnostic capabilities as related to the outbreak of Duck Virus Enteritis in wild waterfowl populations last winter. Present plans are to transfer Dr. Pearson to the Bear River Station some time this fiscal year, preferably as soon as possible.

Senator Young replied by letter on November 28, 1973:

I liked your letter of November 21! You answered all of my questions.

It is clear from this exchange of letters that Dr. Pearson had gotten the Senator's attention with his environmental activity and that the Senator was annoyed. Copies of these letters were sent by Mr. Nelson to his supervisor in Washington, Mr. Townsend, who in turn gave copies to Dr. Loveless.

Dr. Pearson was never transferred to Bear River because the proposed consolidation plan was never implemented. This was due primarily to funding difficulties, but also because the site was eventually determined to be inappropriate. However, planning continued to go forward with a view to establishing the consolidated wildlife disease program at another location.

Late in 1973 or early 1974, shortly before he was transferred to another position, Dr. Loveless verbally instructed Dr. Robert Putz, a Branch Chief in Washington, to develop and proceed with a plan for a centralized, consolidated wildlife disease program. Dr. Eugene Hester, who subsequently moved up into Dr. Loveless' position as Assistant Director for Research in January 1974, also was at the meeting. Dr. Hester confirmed in a February 6, 1974 meeting, that Dr. Putz was to evaluate the entire disease program and come up with a coordinated proposal. Dr. Putz thereafter assigned to Dr. Friend a number of major responsibilities for the disease program during 1974.

Dr. Putz also assigned Mr. Jerry Longcore the responsibility for setting up a meeting of the Service wildlife disease specialists to discuss the consolidation effort. This meeting was held on March 3 and 4, 1974 at the Bear River Station and a variety of topics were discussed regarding a central facility including: purposes and activities of a central disease laboratory, possible sites, research priorities, funding, personnel,

**3.** Senator Young had stated in a news release of October 11, 1971 that, "[s]ince I was responsible for the appropriation which made this [Jamestown Research Center] laboratory possi-ble, I felt I had some responsibility to see that it directed its activities to the purposes for which it was authorized."

and veterinary services involved. The plaintiff attended the meeting, and on March 5, 1974, he assisted Dr. Friend in the evaluation of the Bear River Station as a potential site. Additionally, during March and April of 1974, Dr. Friend visited at least seven other potential sites for the proposed central laboratory, and the plaintiff also helped to evaluate some of those locations. Throughout this period, Dr. Friend frequently contacted the plaintiff and advised him of all developments related to the centralized wildlife disease laboratory proposal. On April 25, 1974, Dr. Friend prepared a detailed memorandum discussing recommendations for the implementation of a wildlife disease program. The memorandum recommended a site at the University of Wisconsin at Madison. This April 25, 1974 memorandum played a major role in the approval and development of the central disease laboratory as the proposal went through the subsequent approval at each level in the Service and in the Department of the Interior.

While those plans for the central laboratory were finalizing, the plaintiff's environmental confrontations with Senator Young continued. On February 20, 1974, Senator Young forwarded to Mr. Nelson a copy of a constituent's letter which complained about the plaintiff's environmental activism against the Garrison Diversion Project. Upon receipt of the letter, Mr. Nelson forwarded the letter to Dr. Loveless and also sent a copy to Mr. Lynn Greenwalt, Director of the Service in Washington. With the letter, Mr. Nelson attached a note indicating that the plaintiff was a problem and that a transfer to a new area would ease the difficulties. When Dr. Loveless received this copy, he forwarded it to Dr. Hester. Finally, Dr. Hester transferred the papers to Mr. Townsend. None of the individuals receiving the copies from Mr. Nelson or Dr. Loveless took any further action on the information. Mr. Greenwalt testified at trial that he couldn't even remember ever seeing the letters much less taking any action on them.

On April 2, 1974, Senator Young forwarded to Mr. Nelson copies of the plaintiff's latest series of letters demanding action, as well as copies of the Senator's responses, which indicated that the plaintiff's letters were so unreasonable that the Senator was not even going to acknowledge them in the future.

The Senator's letter stated:

Harvey, he may be exceptionally well qualified and deserving of a promotion!

Subsequently, on April 24, 1974, the Senator forwarded two of the plaintiff's final letters to Mr. Nelson. Upon receipt of these batches of letters, Mr. Nelson neither replied to the Senator nor did he forward the letters to other Service personnel.

On July 2, 1974, Dr. Putz contacted the plaintiff and notified him that he was being detailed on a temporary basis to the Denver Research Center as the first step in his eventual transfer to the new centralized facility at Madison. The main purpose of the Denver temporary assignment was for the plaintiff to help Dr. Friend in the development of the Madison central laboratory program. The plaintiff stated that he would decline the detail if its acceptance meant that he also accepted a transfer to Madison. The plaintiff indicated that he was reluctant to accept a transfer to Madison because he felt that he had insufficient information to evaluate the new program. In response to the plaintiff's attitude toward the Madison transfer, Dr. Putz agreed that acceptance of the Denver detail would not constitute acceptance of a transfer to Madison.

The plaintiff then reported to Denver on July 11, 1974, and worked with Dr. Friend on the project and on other matters until he returned to North Dakota on August 2, 1974. Of the approximately 16 working days in Denver, the plaintiff spent at least 11 days working directly on disease laboratory consolidation matters by drafting position descriptions, research grade evaluations, and equipment lists. Additionally, the plaintiff spent time at the American Veterinarian Medical Association convention doing unofficial recruiting for the new Service wildlife disease laboratory.

While in Denver, the plaintiff also had discussions with Dr. Friend regarding the proposed consolidated disease program as it related to him. The plaintiff stressed that he needed a complete "package" for his review and assessment before he could decide whether to personally accept reassignment to Madison. Dr. Friend told him that no complete "package" could or would be developed until all the Service professionals were located in Madison.

In a memorandum dated August 5, 1974, the plaintiff voiced his disagreement with the way the organization of the wildlife disease program was developing to Dr. Wayne R. Goforth, the Assistant Director of the Jamestown Center. In this memorandum, the plaintiff stated that "having had the opportunity to review the available information on the proposed wildlife disease program, I [Dr. Pearson] would not be interested in transferring to Madison, Wisconsin." Subsequently, Dr. Putz and Dr. Goforth discussed the plaintiff's reservations about the program as well as his qualifications and the need for him as a part of a central laboratory. It was concluded that his expertise would be necessary as part of the consolidated disease laboratory.

On August 19, 1974, Dr. Putz called the plaintiff and asked him to return to Denver on detail to assist Dr. Friend. The plaintiff balked at the request and asked what would happen if he refused to go to Denver. Dr. Putz told the plaintiff that termination was possible, and the plaintiff then threatened to resign. In response, Dr. Putz advised the plaintiff that he was needed and that he should not resign because it would jeopardize his entitlement to severance pay and other benefits.

On September 10, 1974, the proposal to establish the centralized wildlife disease laboratory at the University of Wisconsin, Madison received departmental approval in Washington. Dr. Friend then advised the plaintiff and the other wildlife disease professionals within the Service of the approval by a memorandum dated September 16, 1974. It was not until November 21, 1974, however, that the University of Wisconsin signed a formal agreement with the Government.

During October 1974, Dr. Friend sent three status reports to the plaintiff and the other wildlife disease professionals. These memorandums discussed laboratory space, priority of projects, and the transfer of Dr. Richard Kocan, a virologist with the Service, to Madison and invited their input into the developing consolidation project. Also during October 1974, the Washington office started processing personnel action forms for the reassignment to Madison of Dr. Friend, Dr. Kocan, and the plaintiff.

In early December 1974, the plaintiff received a formal notice from Dr. Hester of the Service decision to reassign him to the Madison laboratory effective January 10, 1975. The notice acknowledged that Dr. Hester had been informed by Dr. Putz of plaintiff's disinterest in the assignment. In addition, the notice detailed the consequences of a refusal to accept the reassignment.

On December 17, 1974, the plaintiff responded with a letter, which outlined the plaintiff's beliefs as to why the Service wildlife disease programs had failed in the past and which also vented his frustration in not being involved in the planning of these programs in the past. Specifically, the plaintiff's letter protested the manner in which the Madison program had been planned and established. Finally, the letter demanded six minimum requirements that would have to be provided to him for evaluation before he would indicate whether he would accept the reassignment. The minimum requirements included a comprehensive evaluation of the wildlife disease program needs and a guarantee of staffing and funding for the new Madison center.

Since no new funding was initially made available for the Madison facility, the operating budget consisted of fiscal and position transfers from other organization units within the Service. Thus, as part of these fiscal and position transfers, the funding for the plaintiff's position at the Jamestown Center was also transferred to Madison. The plaintiff's position at Jamestown was

funded out of the Migratory Bird Program Fund, and all other Service personnel, who were funded out of the Migratory Bird Program, with certain exceptions, were also transferred to Madison. Dr. Jensen at the Bear River Station was not reassigned to Madison for health and retirement reasons. Some six persons were reassigned to the Madison Laboratory from the various Service Research Center locations as of June, 1975. By May, 1981, the laboratory employed 31 persons, 16 of whom were professional staff.

On December 18, 1974, Dr. Friend was officially selected as director of the new disease laboratory at Madison, and the plaintiff was notified of this action by a December 20, 1974 memorandum. On January 19, 1975, Drs. Friend and Kocan arrived in Madison to begin their duties in connection with the development of the wildlife disease laboratory in Madison.

On February 6, 1975, Dr. Hester responded to the plaintiff's letter of December 17, 1974. Dr. Hester's letter stated in part:

I am sure you are aware that manpower ceilings, funding, and program priorities for any program area are subject to change and cannot be guaranteed. While the Fish and Wildlife Health Laboratory is in its formative stage and a number of issues still have to be worked out, I hope you will take this opportunity to become a part of this project. We consider you to be a valuable employee and look forward to your functioning in this new endeavor.

The letter stated that the plaintiff's decision was needed within 10 days and that a failure to respond would be interpreted as a negative reply. A negative reply would result in an adverse action by the agency proposing the plaintiff's removal from the Service.

On February 11, 1975, the plaintiff responded by letter and reiterated the need for information so as to make "an objective evaluation of the proposed transfer" to Madison. After criticizing the "mindless incompetence" of the Service, the plaintiff also alleged that the transfer was improper-

ly motivated by the actions of Senator Young and Congressman Andrews. Further, the letter requested copies of all correspondence between Senator Young and Congressman Andrews and the Service relating to the plaintiff's employment and position.

On February 25, 1975, Dr. Hester replied to the plaintiff's letter and stated:

You seem to feel that the Service must meet your demands relative to a disease program if you are going to participate in that program. You have all the pertinent information presently available regarding the new program. It is a management right indeed responsibility to allocate resources to best serve mission accomplishment. In this connection it has been determined that the consolidation of disease diagnostic and research capability at the laboratory in Madison is in the best interest of the Service. You may disagree with management's determination or with program direction, past or present; however a management decision has been made. We value your service and would would like to see you contribute meaningfully to the new program. We cannot and need not lay out the entire program for you or how it might specifically develop in the future. The professional staff at Madison will refine and develop the program. We hope that you will welcome the opportunity to assist in molding a program through substantive input * * *.

I am personally unaware of any written communication with Senator Young or Congressman Andrews regarding your employment status. If there has been any verbal contact it has been unrecorded and undocumented. In any event, your move is being directed for no other reason than to meet a legitimate need of the Service's research program.

In addition, the evidence did not establish that there had ever been any direct contact regarding the plaintiff between Senator Young or Congressman Andrews and Dr. Friend, Dr. Putz or Dr. Hester, who were the Service management officials primarily

responsible for planning and staffing the laboratory.

On March 31, 1975, the plaintiff failed to report to Madison as directed. Thereafter, on April 3, 1975, Dr. Putz sent the plaintiff a letter proposing his removal for failure to accept a reassignment to the Wildlife Health Laboratory at Madison, Wisconsin, and for failure to report there on March 31, 1975. The letter reemphasized:

> Your professional skill is needed at the new laboratory. You are a highly qualified waterfowl disease diagnostician. This expertise is particularly relevant to the field diagnostic work within the new program.

In a final effort to convince the plaintiff to transfer and be a part of the new laboratory, Dr. Friend invited him to attend a meeting at the new laboratory location in Madison on May 13, 1975. The plaintiff attended the meeting, was taken on a tour of the new facilities, and was given an outline of the laboratory budget, research and diagnostic priorities and projects. The plaintiff remained unconvinced and did not transfer.

Thereafter, Mr. F. Victor Schmidt, Acting Deputy Director of the Service, conducted an internal review of the plaintiff's proposed termination. After meeting with the plaintiff and reviewing all of the materials, Mr. Schmidt found that the notice of proposed removal was supported by the evidence and that the plaintiff's removal was "for such cause as will promote the efficiency of the Service." He rejected the plaintiff's contention that the proposed reassignment was politically motivated. Hence, on June 27, 1975, the Service removed the plaintiff from his job at the Jamestown Center.

On July 10, 1975, the plaintiff appealed his removal to the Federal Employee Appeals Authority (FEAA) of the Civil Service Commission (CSC). After a lengthy hearing where the plaintiff, who was represented by counsel, presented witnesses and documentary evidence, the FEAA issued a written opinion on August 5, 1976 upholding the agency decision to remove the plain-tiff. On January 21, 1977, the Appeals Review Board of the CSC declined to re-open or reconsider the decision of the hearing officer. This action followed.

### Discussion

Before this court, the plaintiff contends that the CSC decision in this case was arbitrary, capricious, and not supported by substantial evidence, and was procedurally and legally defective. Specifically, the plaintiff argues that his reassignment, and ultimate removal from federal service for failure to accept the reassignment, was improperly motivated by a desire on his agency's part to remove him from North Dakota because of his environmental activism as a private citizen.

The defendant counters that the CSC decision should be upheld because the decision was not arbitrary, capricious, or unsupported by the evidence, or procedurally defective, or otherwise legally defective. The defendant stresses that that reassignment, and ultimate termination, was not motivated by the plaintiff's exercise of his first amendment rights of free speech. Rather, the reassignment was a management decision reached for the good of the Service, and such decision was not influenced by the plaintiff's private environmental activities.

### A. Supplementary Trial Proceedings

It is well settled law that judicial review of administrative actions in the civilian pay area generally is limited. *Wathen v. United States,* 208 Ct.Cl. 342, 351–52, 527 F.2d 1191, 1197 (1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976). The court will not sit as "a super Civil Service Commission." *Sexton v. Kennedy,* 523 F.2d 1311, 1314 (6th Cir.1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 *reh'gs denied,* 429 U.S. 873, 97 S.Ct. 192, 50 L.Ed.2d 156 (1976), 439 U.S. 1104, 99 S.Ct. 886, 59 L.Ed.2d 66 (1979). Specifically, a reviewing court determines whether there has been substantial compliance with procedural requirements and whether the action was arbitrary, capricious, or not supported by substantial evidence. *Schlegel v. United States,* 189 Ct.Cl. 30, 35–36, 416 F.2d 1372,

1375 (1969), *cert. denied,* 397 U.S. 1039, 90 S.Ct. 1359, 25 L.Ed.2d 650 (1970); *Boyle v. United States,* 207 Ct.Cl. 27, 34–35, 515 F.2d 1397, 1401 (1975), and cases cited therein. The presumption is that the agency has acted in good faith. *E.g., Grover v. United States,* 200 Ct.Cl. 337, 343 (1973); *Horne v. United States,* 190 Ct.Cl. 145, 150, 419 F.2d 416, 419 (1969). A plaintiff has the burden to show with specificity the deficiencies requiring reversal of the agency's action. *Gross v. United States,* 205 Ct.Cl. 605, 613, 505 F.2d 1271, 1275–76 (1974); *Poschl v. United States,* 206 Ct.Cl. 672, 692 (1975).

■ Civil Service Commission regulation 5 C.F.R. § 335.102 (1975) authorizes federal agencies to reassign employees under their jurisdiction. *See Comberiate v. United States,* 203 Ct.Cl. 285, 288 (1973). It is well established that federal agencies have broad discretion in exercising this authority. *Comberiate v. United States, supra,* 203 Ct.Cl. at 288; *Urbina v. United States,* 192 Ct.Cl. 875, 880–81, 428 F.2d 1280, 1284 (1970). The Federal Personnel Manual Supplement 752–1 Subchapter S1–3a(4) advises agencies that they may remove an employee for failure to accept reassignment. In addition, the courts have repeatedly recognized the propriety of removing an employee for refusing reassignment. *See Comberiate v. United States, supra,* 203 Ct.Cl. at 288; *Burton v. United States,* 186 Ct.Cl. 172, 404 F.2d 365 (1968), *cert. denied,* 394 U.S. 1002, 89 S.Ct. 1599, 22 L.Ed.2d 780 (1969).

This case originally came before the United States Court of Claims on defendant's motion for summary judgment. In an order dated November 21, 1979, the Court concluded that there were material facts that needed to be resolved and remanded the case to the trial division of the Court (now U.S. Claims Court) [4] for further trial proceedings.

The defendant, since that time, has taken vigorous exception to this remand order, arguing that if material facts had to be resolved, the Court should have returned the case to the Civil Service Commission (now the Merit Systems Protection Board) for further administrative hearing and factual finding resolution, rather than remanding the case to the trial division of the Court for further trial proceedings. It should be pointed out, however, that the Court of Claims had consistently ordered a remand to its own trial division in civilian pay cases in circumstances where it wished certain supplementary factual matters resolved. *See, e.g., Schlegel v. United States, supra,* 189 Ct.Cl. at 36, 416 F.2d at 1375 (1969), *Nibali v. United States,* 218 Ct.Cl. 547, 551, 589 F.2d 514, 516 (1978), *reh'g denied,* Feb. 2, 1979. Based on this consistent precedent, a supplementary trial was held primarily to examine the plaintiff's first amendment claim. Trial was not held for the purpose of "superceding" the CSC's decision on a totally *de novo* basis. *See Nibali, supra.*[5]

Thus, in this case, the Court's decision filed today is based on a thorough review of the CSC's lengthy administrative record in this case and is based on the traditional standards of review enunciated above as supplemented by those facts elicited at trial.

### B. *Motivation For Reassignment*

■ The key issue to be resolved in this case is whether the plaintiff's first amendment rights were violated because his reassignment was based on his private environmental activities. It is clear that an employee's reassignment or dismissal, which is an action taken in retaliation for an employee's exercise of his right to free speech, constitutes a violation of the Constitution. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Van Ooteghem*

---

**4.** Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25.

**5.** The U.S. Claims Court is, of course, still bound by the precedents of the now defunct U.S. Court of Claims. United States Claims Court General Order No. 1, U.S. Cl.Ct. Preced-

ing Rule 1, 28 U.S.C.A. (October 7, 1982); *South Louisiana Grain Services, Inc. v. United States,* 1 Cl.Ct. 281 at 287 (Cl.Ct.1982) (LYDON, J.). *See also South Corp. and Seal Fleet, Inc. v. United States,* 690 F.2d 1368 (Fed. Cir.1982).

*v. Gray,* 628 F.2d 488, 493 (5th Cir.1980), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982). In *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court outlined the appropriate analysis to determine whether such a constitutional violation exists.[6] First, the plaintiff must show that his conduct was constitutionally-protected. *Id.* 429 U.S. at 287, 97 S.Ct. at 576. Second, the plaintiff must also prove that his constitutionally-protected conduct was a substantial or motivating factor in the decision to reassign him. *Id.* Third, if the plaintiff clears these initial two hurdles, then the defendant can still be held free of any wrongdoing if it can show by a preponderance of the evidence that the plaintiff would have been transferred even in the absence of the protected conduct. *Id.*

■ In this case, both parties agree that the plaintiff's environmental activism is constitutionally-protected conduct, and therefore the plaintiff satisfies the initial step of the *Mt. Healthy* analysis. The second step, however, is where plaintiff stumbles with his proof. The plaintiff has failed to prove that his constitutionally-protected conduct was a substantial or motivating factor in the decision to transfer him to Madison.

The plaintiff initially failed to persuade the CSC that his reassignment was motivated by his non-job related private environmental activities. Although the CSC decision did not examine the plaintiff's first amendment claim in this matter, it did base its decision on the same material facts that leads this Court to the same legal conclusions that the CSC initially made. The CSC did not examine the plaintiff's first amendment claim in that proceeding explaining that:

> Because reassignment based on an employee's private non-job related environmental activities is arbitrary and capricious [conduct], we do not find it necessary to reach the First Amendment question.

So, although the CSC could have analyzed the plaintiff's first amendment claim, it chose not to do so, believing (apparently) that its "arbitrary and capricious" standard was but the flip side of the same coin. However that may be, the Court of Claims has granted the plaintiff the right to air his first amendment claim in a supplementary trial proceeding before this Court.[7] Based on the matters presented by plaintiff in that supplementary trial proceeding[8] and after a thorough review of the administrative record in this case, this court concludes that the CSC decision was not arbitrary or capricious, and substantial evidence supported its findings. This Court concurs in the CSC decision that the plaintiff was not reassigned because of his non-job related environmental activities in North Dakota.

This case can perhaps best be perceived as two series of events occurring on two parallel paths. The plaintiff's personal environmental activities ran along one pathway; the Service's reorganization plans relating to its wildlife research program ran along the other pathway. The two paths sometimes crossed, but only rarely, and not critically, and in the main, ran parallel to each other.

It is very clear that the plaintiff's environmental path annoyed a powerful U.S. Senator. These actions irritated Senator Young so much that he wrote letters to the Director of the Jamestown Center to find

**6.** *See also Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).; *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Magaleski v. Treusdell,* 562 F.2d 701 (D.C.Cir.1977).

**7.** It also should be noted that the landmark *Mt. Healthy* case, which established the burden of proof analysis for use in public employee first amendment dismissal cases, was not decided until Jan. 11, 1977, approximately six months after the initial CSC decision in this case was decided.

**8.** In the supplementary trial proceedings, the plaintiff presented very little "new" evidentiary matter that had not been initially presented to the CSC. That evidence which was new was not deemed critical or material.

out what the plaintiff's role at the Center was. These letters make clear that the Senator would have looked very favorably on any decision made by the Service to transfer or reassign Dr. Pearson out of North Dakota. However, the focus cannot be only on the Senator's actions or his motives. The focus must be more directly fixed on the Service's reaction to the Senator's concerns. In short, did the Service react by reorganizing its entire wildlife research program to accommodate this political interest on the part of the Senator? This question must be answered in the negative. The evidence is simply overwhelming that the decisionmaking part of the Service reacted hardly at all to the Senator's concerns.

In fact, it was only Mr. Harvey Nelson, the Director of the Jamestown Center, who received the Senator's letters about Dr. Pearson. Also, it was only Mr. Nelson who responded to the letters. No one else in the Service received from the Senator any communications or responded to any communications from the Senator. Although Mr. Nelson did recommend to his superiors in Washington in July of 1973 that a wildlife center be established at Bear River Station in Utah and that Dr. Pearson be transferred there, this recommendation must be placed in the context of other proposals and meetings occurring at the same time that related to the centralization of the wildlife research function. Moreover, it must be noted that Mr. Nelson never was very high on the decisionmaking chain of authority within the Service at that time, and, therefore, his recommendation cannot be considered as extremely critical or influential.

In the fall of 1973, Dr. Charles Loveless, the Assistant Director for Research in the Washington central office, made a tentative decision to begin the consolidation of the wildlife disease program at the Bear River Station and to transfer Dr. Pearson there. This decision was made after consulting with Mr. Joseph Townsend, Acting Chief of the Division of Wildlife Research, and after discussions with various other officials in the Service and after reading the submitted document proposals (including Mr. Nelson's). This tentative decision to reorganize the program at Bear River and transfer Dr. Pearson there was never carried out, however, and by late 1973, the decision was essentially dead. Moreover, by early 1974, the cast of decisionmaking characters in Washington involved in the Bear River consolidation decision had completely changed. Thereafter, Dr. Eugene Hester, Dr. Robert Putz, and Dr. Milton Friend assumed those roles from Dr. Loveless and Mr. Townsend.

Events to this time (late 1973) mark the plaintiff's high water mark, if he is to prevail on his theory of improper political motivation for his reassignment. From this time forward, however, the facts all point in the opposite direction.

The CSC decision found that Mr. Nelson's July 1973 recommendation was partly motivated by his desire to remove Dr. Pearson from North Dakota to placate Senator Young. However, the decision also found that the Loveless/Townsend decision to consolidate was not so motivated, but was made purely and simply to begin the process of consolidation in order to make the Service more responsive to wildlife disease outbreaks. Substantial evidence supports these findings and the supplementary matters adduced at trial further supports this conclusion. Mr. Harvey Nelson may well have wished to accommodate Senator Young on Dr. Pearson's reassignment, but the gentlemen in Washington had no such desire. They testified that they had no such desire (at the CSC hearing and at the trial), and there is no documentary evidence which would cast substantial doubt on that testimony. There were no letters from Senator Young to these Washington decisionmakers, nor are there any internal Service memorandums that would cast substantial doubt on these findings.

Meanwhile, events along the second path, the Service reorganization path, were proceeding apace. Looking back, it is clear that from the date of the Lake Andes duck plague embarrassment in January, 1973, the Service would fashion some type of a wildlife disease research program in a central

location. All of the eight to ten wildlife disease specialists employed at the various Service locations (Denver, Bear River, Patuxent, and Jamestown) were in favor of it including Dr. Pearson (at least initially). Numerous meetings were held and written proposals authored that strongly recommended that action to the decisionmaking officials in Washington, D.C.

For example, the May 25, 1972 meeting in Denver of the eight Service wildlife disease specialists (including Dr. Pearson) ended with a recommendation for a "single location team approach." Likewise the April 17 and 18, 1973 meeting of the same group (including Dr. Pearson), which took place after the Lake Andes duck plague outbreak, recommended that all Service wildlife disease specialists be physically located in one place and be ready to react to a crisis anywhere it may occur. Following this meeting on May 2, 1973, Dr. Friend authored and submitted his unsolicited proposal entitled "A National Center for the Study of Diseases of Migratory Birds," which was circulated widely within the Service (Dr. Pearson received a copy). On July 13, 1973, Mr. Harvey Nelson submitted his proposal for a consolidated disease laboratory to be located at Bear River. Further, the March 3 and 4, 1974 meeting of the wildlife disease group (including Dr. Pearson) met again at Bear River to discuss the consolidation effort and to recommend potential sites. Finally, on April 25, 1974, Dr. Friend prepared a detailed memorandum regarding the proposed single location wildlife health facility and recommended a site at the University of Wisconsin at Madison, which recommendation was given departmental approval on September 10, 1974.

It is also clear from the evidence in this case that Dr. Pearson had input into virtually every step of the way as the centralized single-location concept developed and flowered within the Service. He attended every significant meeting. He received every significant written proposal. He was given status reports on all developments. He even personally worked on portions of the developing program such as the site selection, personnel job descriptions and equipment lists. Right up to the time of his termination for failure to transfer, he was given as much information as was available within the Service. He certainly had as much information about the program as any other affected individual had, several of whom were also not ecstatic about leaving their established homes and moving to Madison.

In early 1974, Dr. Eugene Hester replaced Dr. Loveless as Assistant Director for Research in Washington, D.C. At that time, Dr. Hester appointed Dr. Robert Putz to reexamine the entire wildlife disease program in the Service and recommend appropriate action. Dr. Putz in turn selected Dr. Friend to assist him in this effort. These three Service officials from this time forward were the critical decisionmaking officials in this case. All of the individuals were witnesses before the CSC hearing and before the Court and all testified that Dr. Pearson's environmental matters had nothing whatsoever to do with their ultimate decisions to consolidate the wildlife disease program at Madison and reassign Dr. Pearson there. This testimony is supported by the fact that none of the three ever received any direct communication from Senator Young nor do any of the internal Service memorandums reflect concern by any of them as to the plaintiff's environmental activities and the concern it was causing Senator Young. There simply is not the "well-nigh irrefragable proof" to overcome the legal presumption that these federal officials acted in good faith. *Grover v. United States, supra,* 200 Ct.Cl. at 344. Substantial evidence, therefore, supports the CSC decision in this regard as does the supplementary evidence produced at trial.

In sum, the evidence contained in the administrative record strongly supports the CSC decision that the plaintiff was reassigned to the Madison laboratory for the good of the Service. That decision was in turn based on a legitimate management decision to reorganize the wildlife disease program in one central location. No evidence received at the supplementary trial proceedings casts any doubt on that conclu-

sion. The primary Service motivation for the reassignment was because the plaintiff was a highly qualified wildlife disease diagnostician and needed for the job. Hence, the plaintiff's environmental activity simply was not a substantial or motivating factor in the decision to reassign the plaintiff to Madison.

Even assuming that the plaintiff's constitutionally-protected conduct was a substantial or motivating factor in the decision to transfer him to Madison, it is clear that the plaintiff's claim would fail under the third step of the *Mt. Healthy* analysis. The Government is free of any wrongdoing if it can be shown by a preponderance of the evidence that the plaintiff would have been transferred even in the absence of the protected conduct. *Mt. Healthy City School District Board of Education v. Doyle, supra,* 429 U.S. at 287, 97 S.Ct. at 576. In this case, it is clear that whether or not the plaintiff was involved in environmental activities, he would have been transferred to Madison due to the reorganization of the wildlife division. As discussed above, the reorganization was a long and costly process, and the plaintiff was chosen for a position at the new facility because of his wildlife disease diagnostic expertise. Therefore, the evidence again points to the fact that the plaintiff would have been transferred regardless of his environmental actions.

## C. *Administrative Record Procedures*

In its order of November 19, 1979, the Court of Claims expressed some concern over the way the plaintiff's procedural rights were handled in the prior administrative proceedings. It is concluded, however, after a thorough review of the entire administrative record in this case, that all the applicable CSC regulations were complied with, both at the preliminary hearing conducted at the Department of the Interior and on appeal before the CSC's Federal Employee Appeals Authority. In any event, to the extent that the CSC may have been deficient in its burden of proof requirements or in its failure to allow plaintiff to reopen or a reconsideration based on

newly discovered evidence, those deficiencies were overcome by the supplementary trial proceedings accorded the plaintiff in this court.[9] A thorough and lengthy airing of all these matters on remand convinces this Court that the CSC decision was ultimately correct and supported by substantial evidence. The plaintiff's reassignment, and ultimate termination, was not substantially motivated by a desire on the part of his Service supervisors to remove him from North Dakota because of his environmental activities, but was primarily and substantially based on the needs of the Service.

### D. *Overtime Claim*

In Count III of its petition, plaintiff makes a claim for overtime pay in the gross amount of $2,760 plus interest. In the parties' Stipulation of Facts filed in this action, the Government concedes that the plaintiff did in fact work some overtime during the June to November, 1972 time frame when ordered to a temporary assignment at the San Gabriel Laboratory in California to assist in the investigation of an outbreak of Newcastles disease virus involving domestic chicken flocks. The number of hours actually worked is apparently still at issue; however, the defendant concedes that plaintiff is entitled to at least $1,551.

The parties agreed at a pretrial conference held April 21, 1981, in this case to set aside the overtime claim for a separate trial, in the event they could not settle the matter. Both parties agreed that settlement of this matter was likely in view of the closeness of their respective positions.

## CONCLUSION

In view of the above discussion, this Court concludes that the plaintiff's reassignment, and ultimate termination, was not substantially motivated by a desire on the part of his superiors to remove him from North Dakota because of his environmental activities. The CSC decision in this case is not arbitrary or capricious and is supported by substantial evidence in the record. Consequently, the petition is dis-

9. *See also Levinson v. United States,* 1 Cl.Ct. 203 at 207 (Cl.Ct.1982) (LYDON, J.).

missed as to Counts I and II and final judgment shall issue.

Count III of the petition relating to the plaintiff's overtime pay claim remains for adjudication. The parties have 60 days to notify the Court of their intentions in regard to Count III.